JOHN M. YOUNG, *Plaintiff*, v. THE REGENTS OF THE UNIVERSITY OF KANSAS, *Defendants*.

No. 18,013.

SYLLABUS BY THE COURT.

1. MANDAMUS — *School of Mines* — *"Party Beneficially Inter-· ested."* The plaintiff is a citizen of Weir, the owner of a home there and the head of a family. He is a coal miner by· trade and the superintendent of several coal mines in his vicinity. He desires and intends to attend the. school of mines and metallurgy created by chapter 30 of the Laws of' 1911, and educate himself in the branches of learning required to be taught there, having already taken a consider-· able portion of the courses of study provided for, and he has ·a son whom he desires and intends to educate at the school. *Held*, he is entitled to maintain an action of mandamus in his own name to compel the establishment of the school, under section 715 of the civil code, which provides that the writ of mandamus may issue on the information ˙of "the party beneficially interested."

2. STATUTES—*Interpretation—Intent of Legislature.* ˙ It is the-· duty of the court to interpret a ˙statute designed to ameliorate social conditions and promote the general welfare of the people of the state in such a way that it may be upheld and not. nullified, if it be possible to do so, and in such a way that the intention of the legislature may be carried out to the fullest.

extent. A *casus omissus* should not be acknowledged if by any reasonable interpretation the statute may be . read to avoid it.

3. SCHOOL OF MINES—*To Be Established by Regents of University.* The duty of establishing the school of mines and metallurgy created by· the statute referred to in paragraph 1 is imposed upon the regents of the University of Kansas.

Original proceeding in mandamus. Opinion filed May 11, 1912. Writ allowed.

*Charles Stephens,* and *Fred A. Walker,* for the plaintiff.

*J. W. Green,* for the defendants; *C. F. Foley,* of counsel.

The opinion of the court was delivered by ·

BURCH, J.: The plaintiff prays for a peremptory writ of mandamus to compel the board of regents of the State University to locate and establish at Weir, in Cherokee county, the State School of Mines and Metallurgy created by chapter 30 of the Laws of 1911, which took effect on March 31, 1911, and which reads as follows:

"AN ACT creating a State School of Mines and Metallurgy, at Weir, Kansas, for the purpose of teaching the scientific knowledge of mining and metallurgy in the state of Kansas, and making appropriation therefor.

"*Be it enacted by the Legislature of the State of Kansas:*

"SECTION 1. A school of mines and metallurgy is hereby created for the state of Kansas, said school to be located and established at the town of Weir, Cherokee county.

"SEC. 2. The principal purpose of said school of mines shall be to teach such branches in mining and metallurgy as will give a fair technical knowledge of mines and mining, and all subjects pertaining thereto, including physics and mining, engineering, mathematics, chemistry, geology, minerology [mineralogy], metallurgy, the subject of shop work and drawing, the technical knowledge and properties of mine gases, assaying, surveing [surveying], drafting of maps and

plans, and such other subject[s] pertaining to mining engineering, as may add to the safety and economical operation of mines within the state.

"SEC. 3. The school of mines and metallurgy herein provided for shall have a separate and distinct faculty.

"SEC. 4. The faculty of the school of mines and metallurgy shall have the power under the direction of the board of regents herein provided to confer degrees and issue diplomas, and fix a standard of grades for all students attending said school of mines, and the faculty will also have the power to make such rules and regulations for the proper control and management of the school, as they may deem necessary.

"SEC. 5. The school of mines and metallurgy shall have regular courses leading to degrees and issue diplomas, and such other special courses as the faculty may deem necessary. The regular course shall extend over a period of four years.

"SEC. 6. Said school of mines and metallurgy shall be a separate and independent institution of learning, and one of the colleges of the state, and shall be under the supervision and control of the board of regents of the State University.

"SEC. 7. At the close of each year, the board of regents shall make a report to the governor in detail, exhibiting the progress, conditions and wants of the several departments of instruction in said school. The course of study in each, and the number of names of the officers and students, the amount of receipts and disbursements, together with the nature, cost and results of all important experiments and investigations, and such other matter, including special industrial and economical statistics as may be thought useful. The board of regents shall cause the same to be printed for the use of the legislature and the people of the state, and shall cause one copy to be transmitted by mail free of expense to the secretary of the interior, and one copy to the commissioner of labor at Washington city, and one copy to the secretary of mine industries of the state.

"SEC. 8. That for the purpose of carrying out the provisions of this act there is hereby appropriated, out of any money in the state treasury not otherwise appropriated, for the fiscal year ending June 30, 1912,

16—87 KAN.

twelve thousand five hundred dollars, and for the fiscal year ending June 30, 1913, twelve thousand five hundred dollars.

"SEC. 9. The auditor of state is hereby authorized to draw his warrants upon the treasurer of state for the amounts and purposes specified in section 8 of this act, upon verified vouchers duly itemized and approved by the board of regents of the University of the state of Kansas."

The plaintiff alleges and by his proof shows that he is a citizen of Weir, the owner of a home there and the head of a family; that he is a coal miner by trade and is the superintendent of six large coal mines in the vicinity of Weir; that it is his desire and intention to attend the school and educate himself in the branches of learning required to be taught there; that he is eligible to enter the school and receive the instruction which it is intended to afford, having already taken much of the courses provided for; that he has a son whom he desires to educate at the school and who is eligible to enter it; and that because of the failure of the board to establish the school the plaintiff and his son are deprived of the benefit of the act. The members of the board admit that they are the regents of the University of the State of Kansas, but say that they have been sued individually and not in their corporate capacity and that as individuals they have no power to act under the statute. They say, too, that the plaintiff has not demanded of them the performance of the duties specified in the act, and consequently that they are not in default. Further answering, the regents claim that the duty to establish the school is one owed to the state and not to the plaintiff as a private individual, who shows no special or peculiar interest in the matter authorizing him to sue, and consequently that any action to compel the performance of the duty must be brought in the name of the state by its law officers. Finally, it is asserted that the duty of establishing the school is not imposed upon the regents but

that their power and authority is limited to supervising and controlling the school when it shall have been established.

The two matters first urged in opposition to the granting of the writ are formal and technical.

The body of the petition shows plainly enough that nothing is asked of the regents as private individuals but that the purpose of the suit is to secure action by the corporate body designated in the statute. If any amendment be necessary to make the title of the petition correct in form such amendment will be considered as having been made.

No demand was necessary to call the attention of the regents to their duties under the statute, but if such were the case the answer gives no intimation that a formal demand by the citizen of Weir who brings the suit would have moved the regents to establish the school. On the other hand, they take the position that he has no legal right to importune them to act; that their responsibility is not to him but is to the state alone; and that they have no duty and no authority, under the statute, to establish the school. If otherwise entitled to it the plaintiff will not be denied relief because he neglected to do a formal and useless thing.

If, as the regents assert, the plaintiff has no interest in the establishment of the school which the law recognizes, he ought not to vex them with litigation about it. The statute provides that the writ of mandamus "may issue on the information of the party beneficially interested." (Civ. Code, § 715.) The party beneficially interested in the discharge of a purely public duty is the public as a whole. If such a duty be neglected the public is the party injured. As a matter of good government each individual is interested in the proper discharge of the duties of public officials, but so long as his interest is merely that which he shares in common with other citizens he must look to the law officers of the state to correct official delin-

quencies. An individual may have, however, a particular interest of his own, independent of that which he holds in common with the people at large, in the performance of a statutory duty imposed upon some officer or board. In such cases he is not simply an indistinguishable unit of the general public, but he is the possessor of a separate and peculiar right which enables him to say that he is the party beneficially interested, and so bring himself within the cited provision of the code. These rules were recognized early in the history of the. court in the case of *Bobbett v. The State, ex rel. Dresher,* 10 Kan. 9, the syllabus of which reads as follows:

"Mandamus will not lie at the instance of a private citizen to compel the performance of a purely public duty.

"Such a suit must be brought in the name of the state, and the county attorney and the attorney-general are the officers authorized to use the name of the state in legal proceedings to enforce the performance of public duties.

"Where a private citizen sues out a mandamus he must show an interest specific and peculiar in himself, and not one that he shares with the community in general."

The question is, therefore, whether or not the plaintiff has a specific and peculiar interest in the establishment of a school of mines at Weir according to the act of 1911, not shared by the community in general.

There are no rules for the accurate determination of such questions and their solution depends upon a fair and candid exercise of the faculty of discrimination. In some cases the private interest is patent. Thus the purpose of the legislature in providing for the registration of land titles is primarily to foster the general welfare by preserving and keeping open to public inspection the evidence by which such titles may be known and established. But any man may, by mandamus, compel the register to record his deed;

and an abstracter of titles, whose business consists. in supplying interested persons with information taken from the records, may by mandamus enforce his right. to examine such records and take memoranda or make copies from them. (See *Boylan v. Warren, Clerk,* 39 Kan. 301, 18 Pac. 174.) Although the duty of the official be enjoined upon him in the interest of the whole people, it is not necessary for one personally concerned in the performance of the duty to apply to the attorney-general or to the county attorney, for relief. In other cases the independent private interest is not so readily distinguishable, but is sufficiently clear to entitle it to recognition. In the case of *Simpson v. Osborn,* 52 Kan. 328, 34 Pac. 747, twenty-five petitioners nominated a candidate for a public office. It was held that one of them possessed such a peculiar and special interest in having the name of the nominee appear on the official ballot that he could maintain an action of mandamus to require the secretary of state to certify the nomination to the various county clerks. In still other cases the personal interest is not separable from that of the people in general. In the case of *Titus v. Sherwood,* 81 Kan. 870, 106 Pac. 1070, the presiding officers of five local miners' unions were authorized to demand of the president of the state association of miners that he convene the delegates to the association for the purpose of electing a state secretary of mining industries. The election and removal of this officer are subjects of general public interest. His duties affect not only mine workers and miners' unions but mine owners and indeed all the people of the state at large. Consequently it was held that the union presidents were not authorized to bring an action of mandamus against the state president in their own names. They could only make demand upon him, and after that, if the situation required, the proper public officer should have been appealed to for action in the name of the state.

The state fosters higher education in order that it

may improve the quality of its citizenship. The purpose is to equip the limited number of young men and young women who are able to attend college for the conduct of life in such a way that the civic life of the state as a whole may be quickened and elevated and improved by their presence and activities.    The benefits thus conferred are social and general and all the people of the state participate in them.   The instruction afforded by the school of mines will lead to the conservation of the state's mineral resources, to the economic and beneficial conduct of mining and its related industries, and of more value than these, to the better security of labor in a hazardous employment. To the parent, however, who is charged with the moral and legal duty of nurturing his own offspring to a state of maturity and self-sustentation, and who has the opportunity of· availing himself of the advantages afforded by some state professional school, the general social benefits of the institutions which have been described seem to be quite remote.   To him the school presents itself as an immediate agency for imparting information, inculcating skill, disciplining the faculties and giving command over the materials and tools of judgment, whereby his child may be prepared to lead a useful and productive life; and to him who desires to take the courses of instruction offered the school presents itself not only as a means whereby he may acquire the power of adequately and satisfactorily maintaining himself and any who may be or may become dependent upon him, but also as the means whereby he may open new reaches of his personality and realize to the fullest extent his highest capabilities. These benefits are direct, immediate and personal, and are incapable of being shared by any except the few who experience them.  If this analysis be correct the plaintiff, or any other person similarly situated, is beneficially interested in the establishing of this school, within the meaning of the code.   The plaintiff oc-

cupies·the same relative position as the man who asks to have his instrument recorded and as the abstracter who desires to inform himself of the history of some title shown by the records.  They share with the man who has no deed to record or title to examine in the general peace, good order and security consequent upon the maintenance of the public registry; but they have a special, ·peculiar and independent interest in the personal recognition which they are entitled to receive.  The supreme courts of various other states have reached similar· conclusions in analogous cases.

In the case of *Maddox, et al., v. Neal, et al.,* 45 Ark. 121, it appeared that separate schools were maintained for white and colored children.  The school directors provided a teacher for the white ˙children but disregarded their statutory duty to employ a teacher for the other school.  It was held that private relators having children entitled to the benefits of the school could enforce the duty by mandamus.  The syllabus reads:

"The parents of children of scholastic age are proper parties to a petition for mandamus to compel the directors of a school district to establish schools." (Syl. ¶ 3.)

In the opinion it was said:

"The interest of the petitioners and their consequent right to insist upon the performance of the legal duty come from their relationship to the infant children. 'The father,' says Judge Cooley for the supreme court of Michigan, 'is the natural guardian for the child, charged with his nurture and education, and having a personal duty to perform in respect thereto.  Although the proceeding is for the benefit of the child, the duty of placing him in school is the parent's and the father is entitled on his own behalf to appeal to the courts for the removal of any unlawful impediments.' *People ex rel. Workman v. Board of Education,* 18 Mich. 460. Many of the reported cases of this character have proceeded upon the same principle."  (p. 127.)

In the case of *Eby v. School Trustees,* 87 Cal. 166,

25 Pac. 240, a schoolhouse had been destroyed and the trustees were about to erect a new one upon another site. The electors of the district had voted that the site should not be changed, and it was held, under a code provision similar to our own, that Eby could, by mandamus, compel the trustees to proceed to rebuild at the old location. In the opinion it was said:

"The interest of the plaintiff in the performance of this duty by the trustees of the district resulted from his being a resident elector of the district having a family of minor children entitled to school privileges therein. After the site for the schoolhouse had been lawfully established and fixed by the meeting of the electors he was entitled to all the benefits and conveniences incidentally resulting therefrom to him individually, besides his interest in common with other residents of the district in having the trustees perform an official duty enjoined by law for the common benefit of all. . . . These later cases seem to be in accord with the weight of authority in other states and in England, as stated by Mr. Justice STRONG in delivering the opinion of the court in the case of *Union Pacific R. R. Co. v. Hall,* 91 U. S. 354, in which mandamus was maintained at the suit and in the name of two merchants to compel the respondent to operate its road across the Missouri River, etc., although these merchants had no interest in the proceeding, except to receive and ship goods over the road, as did all other merchants engaged in like business. . . . Besides, in this case, the respondent, as one of the patrons of the school, has, as such, an interest in the erection of the schoolhouse, other than that of a mere taxpayer, and his interest may have been different from that of any other taxpayer in that the removal of the schoolhouse to a distant place might have deprived his children of the benefit of attending the public schools." (pp. 173-176.)

In Iowa the code of civil procedure provided that the order of mandamus may be granted on the petition of any private party aggrieved. In the case of *Hightower v. Overhaulser et al.,* 65 Iowa, 347, 21 N. W. 671, it was held that the plaintiff, who claimed to be injured in the matter of school facilities for his children, could

institute mandamus against the directors of a township district to compel them to act on the petition of the plaintiff and others to detach the territory in which they lived from the township district and attach it to an independent district.

In the case of *Atkinson et al. v. Hutchinson et al.*, 68 Iowa, 161, 26 N. W. 54, private relators were permitted to institute an action of mandamus to compel school directors to restore a removed schoolhouse to its original site, or to erect another thereon.

In the case of *Hancock v. The Dist. Tp. of Perry*, 78 Iowa, 550, 43 N. W. 527, the plaintiffs were residents and taxpayers of the township of Perry. The defendants were the district township of Perry and its board of directors. The plaintiffs resided upon sections 5 and 6, which constituted a part of the civil township. Seventeen children, over the age of five and under the age of twenty-one years, resided upon those sections. There was no schoolhouse in the township of Perry within two and one-half miles of the center of the sections named. The defendants refused to recognize them as constituting any part of the district township of Perry, and refused to provide a school for the children residing on them. The plaintiffs asked that the defendants be commanded to recognize such sections as forming a part of the district township of Perry, to organize them as a sub-district, or else to make them a part of a sub-district, and to provide a school for the children living on them. It was held that mandamus was the proper remedy.

In the case of *Brophy v. Schindler*, 126 Mich. 341, 85 N. W. 1114, private relators filed a petition for a writ of mandamus against the highway commissioner and the official board of a civil township to compel the building of a bridge across a stream in place of one which had become unfit for use. In the opinion it was said:

"In this case it is shown that at least some of the relators suffer not only in common with the general pub-

lic, but that they suffer special injury because of the neglect to rebuild this ·bridge, and that they have a special interest in its construction. This bridge is part of a public highway which has been in existence more than 40 years. No part of the highway has ever been vacated. The river over which this bridge was constructed divides the farms of some of the petitioners, so that to go to his work, the farmer has to travel a long distance. Some of the petitioners live on one side of the river, while the schoolhouse to which they send their children is on the other side of the river. To get the children to school, it is necessary either to use a boat, or to travel much farther than it is practicable for them to do in all kinds of weather. We think the petitioners have shown such an interest as entitled them to file this petition." (p. 347.)

In the case of *Heintz v. Moulton et al.*, 7 S. Dak. 272, 64 N. W. 135, an action of mandamus was brought by a private relator to compel school directors to establish a school which should be accessible to the plaintiff. The statute then in force provided that the writ should issue on the application of the party beneficially interested. The court said:

"It appears, from the affidavit upon which the application was based, that the relator, a legal voter, and taxpayer of said district, has four children of school age entitled to school privilege therein; that the schoolhouse in question, to which he must send his children, if at all, as presently located, is three miles from his place of residence, and that said children are thereby deprived of school privileges; that if the schoolhouse were removed to the location described in said affidavit, and designated by the voters of said district as· the site to which the same should be removed, he would then reside but one mile and a ˙half therefrom, and could send his children to school. We ˙think he has shown himself to be a party beneficially interested, and entitled to make an affidavit and application for the writ, under section 5518 of the Compiled Laws, and that the proceeding should not be entitled in the name of the state." (p. 275.)

In the case of *Swenehart v. Strathman et al.*, 12 S. Dak. 313, 81 N. W. 505, the action was brought by

Swenehart against the board of directors of his school district. The syllabus reads:

"The compulsory education act (Laws 1897, p. 138, chap. 7) provides that where pupils reside at an unreasonable distance from the nearest school house, the 'school board make reasonable financial provision' for their transportation to some other school in the district; and that, when any school is discontinued by the board, it shall make arrangements for the transfer of pupils to some other school. *Held*, that since such act is for the benefit of the individual and public, generally, the word 'may,' as used therein, means 'must,' and hence mandamus will lie to compel a school board to maintain a school in a school house within a mile of plaintiff's residence, or provide transportation for his child to the only other school in the district, four miles distant."

In the case of *Porter v. The State,* 78 Tex. 591, 14 S. W. 794, the syllabus reads:

"Parents of children within the scholastic ages, residents in a school district, may prosecute a suit for mandamus against the county judge for refusal to appoint trustees for the district when it is his duty under the school laws to do so." (Syl. ¶ 3.)

The regents argue that it is impossible for the plaintiff to show that either he or his son is eligible to enter the school of mines and metallurgy because the requirements for admission have not been fixed, and no person can say that he is entitled to the privilege of attending the school until that is done. This argument merely undertakes to justify a breach of a composite duty by a breach of one of its elements. The plaintiff shows that he desires and intends to acquire the technical knowledge of mines and mining referred to in the statute, including the subjects specified in section 2, with some of which he is already familiar; and that he desires and intends to educate his son in those branches of knowledge. Therefore, he is entitled to know what the entrance requirements will be and to demand of the regents that they arrange the courses of study, fix the

standards for admission and appoint a faculty to ascertain the qualifications of himself and his son to receive instruction, either in those courses which lead regularly to a degree or in any special courses which may be offered in accordance with section 5. The plaintiff is entitled to the privileges of the school if he can meet the entrance requirements, and the refusal to give him an entrance examination whereby he can establish his qualifications is merely an arbitrary method of excluding him from the school. The conduct of the regents places the plaintiff in much the same situation as that of a person who was unable to exercise the right to follow the profession of teaching school because the county superintendent refused to give him the examination essential to the granting of a teacher's certificate. It was held that he could maintain an action of mandamus to compel the superintendent to examine him with reference to his fitness and qualifications to teach, and to certify accordingly. (*Kell v. Rudy,* 15 Pa. Co. Ct. 309.) In this case the making of suitable provision for ascertaining the plaintiff's competency involves the establishing of the school.

The regents insist that, no matter how beneficially the plaintiff may be interested, they have no power to establish the school; that their function is limited to supervision and control when the school shall have been established, and that however much the legislature may have intended to provide for instituting and equipping the school it failed to confer authority upon any one to do so.

The question thus raised is one of interpretation, and the regents appeal to certain well-established rules of interpretation to support their view. Where the meaning of a statute is clear there is no room for interpretation. The meaning must be ascertained from the words used. The context, the whole act, statutes *in pari materia,* and all extraneous circumstances which may be supposed to have affected the mind of the leg-

islature may be taken into consideration in case of ambiguity, but the intention thus ascertained must be consistent with and fairly expressed by the words employed. To depart from the meaning expressed by the words is to alter the statute, to legislate and not to interpret. Defects which might have been corrected and omissions which might have been supplied had the attention of the legislature been directed to them can not be remedied by the courts. The maxim to be applied in this instance is, *expressio unius est exclusio alterius,* and force and effect must be given to the language used, without departure from its ordinary signification, regardless of consequences or of any notion of justice or public policy which the court may entertain. Applying these rules, the defendants focalize attention upon the words "created," "located," and "established" used in section 1, and the words "supervision" and "control" used in section 6, demonstrate with ease the ordinary difference in meaning between the two sets of terms, and then make an argument fairly represented by the following extracts from the brief:

"What power is granted to the Board of Regents of the State University by this act? Section 6 provides that said school of mines and metallurgy shall be a separate and independent institution of learning and shall be under the supervision and control of the Board of Regents of the State University. To what school does section 6 refer? Evidently to the school of mines and metallurgy provided for in section 1. This provides for a school of mines and metallurgy to be located and established at the town of Weir. Established by whom? Evidently not by the Board of Regents as they are only given the power to supervise and control. . . . Now, supervision presumes something in existence over which supervisory powers may be exercised. The authority granted to the Board of Regents was to superintend, to inspect this school after it was established, and they were given power to control. This again gave them the power over something established, the power to govern, to direct,

and to manage it when established. . . . The burden of erection of buildings or of locating the school so far as this act is concerned may as well be placed upon an equal number of other citizens of the state as upon the Board of Regents. It undoubtedly was the intention of the legislature to locate and establish a school of mines and metallurgy at Weir, Cherokee County, but it failed to give any one the authority to erect the school and make it a going concern. If the legislature had intended to place this burden upon the Board of Regents of the State University, and here I call your attention to the fact that this school was to be no part of the State University or connected with it in any way, it would have placed the burden upon them in definite and certain terms and not left their command to implication or construction of language. . . . Nothing will be presumed. The power and authority must be found in the act. Of course there are certain implied powers which may be derived from the express power given; for instance, if the power and duty had been placed upon the Board of Regents of the University of Kansas to establish said school they could use all reasonable means or agencies to accomplish this purpose, but that power was not granted them. They have the power to supervise and control. . . . . It is unfortunate that the legislature neglected to give this power and authority to any one. It is a clear case of *casus omissus*, and this Act must be construed within its rules."

This interpretation makes waste paper of the statute and convicts the two houses of the legislature which enacted the law and the governor who approved it of conduct quite idle and absurd. The words "A school of mines and metallurgy is hereby created for the state of Kansas" are nullified, the appropriation made to carry out the purposes of the act is defeated, and the effort to confer even supervising and controlling authority upon the board of regents becomes merely an exercise in the drafting of bills and a drill in parliamentary procedure, instead of legislation.

The fifth rule for the construction of statutes laid down by Blackstone is that "one part of a statute must be so construed by another that the whole may (if pos-

sible) stand, *ut res magis valeat, quam pereat.*"    (1 Cooley's Blackstone, 4th ed., p. 89.)    The Roman law expressed the same rule in terms but little less specific: "*Benignius leges interpretandae sunt quo voluntas earum conservetur,*" "Laws are to be more liberally interpreted in order that their intent may be preserved.". (Digest, 1, 3, 18.)    Grotius says that the principal topics from which meaning may be collected are the matter, the effect and the conjoined circumstances, and discusses the second topic as follows:

"From the Effect; in which the main case is, when a word taken from ordinary use draws with it an absurd effect.    For if the word be ambiguous, the interpretation is rather to be taken which involves no absurdity. Hence the quibble of Brasidas was not to be admitted, who, having promised that he would depart from the Boeotian territory, denied that that was Boeotian territory which he occupied with his army; as if the term were to be understood of warlike possessions, not of the ancient boundaries; in which sense the compact was unmeaning."    (De Jure Belli et Pacis, Lib. II, ch. XVI, VI.)

Among the rules which Vattel applies to treaties, statutes and other instruments is this one:

"The interpretation which renders a treaty (or statute) null and void, cannot be admitted; it is an absurdity to suppose that after it is reduced to terms, it means nothing.    It ought to be interpreted in such a manner, as that it may have effect, and not to be found vain and illusive."    (Potter's Dwarris on Statutes and Constitutions, p. 128.)

In the case of *Curtis v. Stovin,* (Law Rep. 1889) 22 Q. B. D. 513, Lord Justice Bowen said:

"The rules for the construction of statutes are very like those which apply to the construction of other documents, especially as regards one crucial rule, viz. that, if it is possible, the words of a statute must be construed so as to give a sensible meaning to them.    The words ought to be construed *ut res magis valeat quam pereat.*"    (p. 517.)

In the case of *The Queen v. Skeen*, 28 L. J., n. s., 91, the chief justice, Lord Campbell, said:

"Where by the use of clear and unequivocal language, capable only of one construction, anything is enacted by the legislature we must enforce it, although, in our own opinion, it may be absurd or mischievous. But, if the language employed admit of two constructions, and according to one of them the enactment would be absurd and mischievous, and according to the other it would be reasonable and wholesome, we surely ought to put the latter construction upon it as that which the legislature intended." (p. 94.)

In the case of *Plumstead Board of Works v. Spackman*, 13 Q. B. D. 878, Sir William Brett, master of the rolls, said:

"And yet it is contended that the magistrate, by this legislation, is bound to order a person who has built his own house, at his own cost, on his own land, to pull it down, and that the first legal tribunal before which the case comes, is bound to make an order and to do a great injustice. It may be that that is the law. If that is the true interpretation of the statute, if there are no means of avoiding such an interpretation of the statute, a judge must come to the conclusion that the legislature by inadvertence has committed an act of legislative injustice; but to my mind a judge ought to struggle with all the intellect that he has, and with all the vigour of mind that he has against such an interpretation of an Act of Parliament; and, unless he is forced to come to a contrary conclusion, he ought to assume that it is impossible that the legislature could have so intended. . . . When the words of an Act of Parliament, being read in their ordinary meaning, are capable of an interpretation which will work manifest injustice, yet if it is possible within the bounds of any grammatical or reasonable construction to read the Act so that it will not commit a manifest injustice, the Court ought to construe it upon the assumption that the legislature did not intend, by the words that it has used, to enact that which will perpetuate a manifest injustice." (pp. 886, 887.)

In the case of *Yates v. The Queen*, 14 Q. B. D. 648, Lord Justice Cotton said:

"It was said in argument for the plaintiff in error

that we ought to give effect to words in a statute though
they may lead to what we may consider to be an ab-
surdity or incongruity, and leave it to the legislature to
correct the mischief which may result from the fair
interpretation of the words.   Undoubtedly where Par-
liament has made use of words which have no applica-
tion unless they be construed in a way which would lead
to an absurdity, it is not for this Court to correct what
has been done by Parliament.   But it is a very different
thing where Parliament has used language of a generic
or general character applying to various things.   In
such a case, if one sees that by applying the language
to something which is not within the mischief con-
templated by the Act, it will produce manifest ab-
surdity or inconvenience, then according to the rule of
construction which is well known, and for which it is
unnecessary to refer to any authority, it is the duty of
the Court so to construe the general term as not to
apply it to that which will have such a result."
(p. 659.)

In the case of *Steadman v. Robertson*, 18 N. B. 580,
the supreme court of New Brunswick was called upon
to determine the powers of the Canadian parliament
and of the provincial legislatures, respectively, under
the British North American act—a question identical
in every respect with one of constitutional interpreta-
tion in this country.   The parliament of Canada was
empowered by the British North American act to legis-
late exclusively upon the subject of "Sea Coast and
Inland Fisheries," and had passed an act for the regula-
tion of fishing and the protection of fisheries, under
which the minister of marine had granted a license to
fish in a certain stream.   The British North American
act empowered the legislatures of the various prov-
inces to legislate exclusively upon "property and civil
rights in the province," and under this power a grant
had been made of the land through which the stream
flowed.   The action was brought by the riparian pro-
prietor for a trespass committed by the licensee.   The
court held that a license from the minister of marine

17—87 KAN.

to fish in fresh-water rivers not the property of the dominion, and the soil of which is not in the dominion, is illegal and void.

In the opinion, delivered by Mr. Justice Fisher, it was said:

"Maxwell on the Construction of Statutes says: 'The intention must be such as the Legislature has used fit words to express. Again it must not be collected from a particular expression, but from a general view of the whole act. When it is subject to a two-fold construction the rule is to adopt such an interpretation *ut res magis valeat quam pereat.*'

"If it had been the intention to confer any greater power—that is authority to interfere with private rights and property—it would have been so enacted in express terms. It is a principle of construction that such rights must not be taken away except by express words or necessary intendment.

"This is a construction consistent with the whole spirit and object of the Act and will give to each of the powers of legislation its full scope, and limit each to the authority contemplated by the Act. . . . In conferring upon the Local Legislatures the power to legislate upon property and civil rights, I am of opinion it was the intention that this power should only be trenched upon to the extent required to enable Parliament to exercise the authority to legislate upon the different subjects assigned to it, and the Parliament, in legislating upon the subjects, within its competency, can only so far interfere with property and civil rights as is necessary to work out the legislation upon the particular subjects specially delegated to it. The authority to deal with the fish, the property of individuals, and to appropriate that property, is not necessary to the working out of the powers relating to 'Sea Coast and Inland Fisheries.' Any other construction brings the two classes into conflict. On the other hand by construing 'Sea Coast and Inland Fisheries' as an authority for Parliament to legislate for the protection and regulation of the fisheries, there is no interference with the rights of property, and each class preserves its power of legislation in its integrity—there is no conflict. This construction of the Act enables both classes to run together and is consistent with common sense,

and no Act of Parliament should be construed contrary to common sense." (pp. 594-596.)

In the case of *The People v. Simeon Draper*, 15 N. Y. 532, the New York Metropolitan Police Act of 1857 was sustained. The opinion of the court was delivered by Chief Justice Denio, and contains the following observations:

"It is a sound rule of legal construction, as well as of literary criticism, that every part, nay every word of a statute or a written instrument shall, if possible, have effect. 'One part of a statute must be so construed by another that the whole may, if possible, stand, *ut res magis valeat quam pereat.* (1 Bl. Com. 89.)' . . . It is said, however, that courts of justice have nothing to do with results and consequences, and take no concern in the effects of their judgments. Generally, and especially as to judgments which affect private rights only, I admit the force of the observation. I nevertheless deny its application to decrees and adjudications which affect public rights, and involve the construction of statutes and ordinances, legislative or organic. In respect to them the courts are bound to consider what is to follow, and give the consequences some weight in their deliberations. If they will plainly be such as the framers could not have intended, such as will turn aside their purposes and frustrate their designs apparent upon the face of the instrument, then the construction which will produce such results must be rejected and avoided, and some other adopted in its place. Mr. Justice Blackstone has remarked 'that the intention of a law is to be gathered from the words, the context, the subject matter, the effects and consequences, and the reason and spirit of the law. That illustration may be further derived from the subject matter with reference to which the expressions are used. That the effects and consequences of a particular construction are to be examined, because if a literal meaning would involve a manifest absurdity, it ought not to be adopted. And that the reason and spirit of the law and the causes which led to its enactment are often the best exponents of the words, and limit their application.' (Story on Const., § 400.) Here is the authority of two of the great commentators upon English and American law, that effects and consequences are material elements in

determining the sense of written instruments, and if a particular construction involves a contradiction or an absurdity it must be rejected." (pp. 567, 572.)

Similar judicial utterances come from every section of this country.

"A statute must be construed, if possible, so as to give it force and effect. (*Hettel v. District Court*, [1908] 30 Nev. 382, syl. ¶ 3, 96 Pac. 1062.)

"It is a cardinal rule in the construction of statutes, that effect is to be given, if possible, to every clause and sentence, and it is the duty of Courts so far as practicable, to reconcile the different provisions of a statute so as to make the whole of it consistent and harmonious; and where this is impossible, to give effect to what was manifestly the intention of the Legislature." (*Attorney General ex rel. McKay v. Detroit & Erin Plank Road Company*, [1851] 2 Mich. 138, syl.)

"The construction of a statute which will sustain its validity must be adopted, if possible, under the language employed." (*Commonwealth v. International Harvester Co.*, [1909] 131 Ky. 551, syl. ¶ 15, 115 S. W. 703.)

"A construction which completely nullifies a plain statutory provision, and thereby does violence to the legislative will, can not be adopted, when the law is susceptible of another construction, which is reasonably in harmony with the apparent object sought to be accomplished by the legislature." (*State v. Duis, et al.*, [1909] 17 N. Dak. 319, 323, 116 N. W. 751.)

The foregoing quotations, representing the best juristic thought of ancient and modern times, show that whenever they are brought to bear upon the subject the enlightened mind and conscience inevitably perceive that promulgations of law ought always to be read in such a way that they may be upheld and not nullified, if it be possible to do so, and in such a way that the purpose and intention of the legislator may be carried out to the fullest extent.

We may join the judges in England in lamenting that we are driven to get at the meaning of statutes by removing obstacles, as far as can be, by interpretation,

rather than that the legislative intention should be clearly expressed on the face of the act. (North, J., in. Wigram v. Fryer, [Law Rep. 1887] 36 Ch. Div. 87, 99.) The task of interpretation is both difficult and delicate. On the one hand, nothing is so easy as to pull statutes to pieces. (Lord St. Leonards in O'Flaherty v. M'Dowell, 6 H. of L. Cas. 142, 179.) On the other hand, interpretation in the direction of making statutes effective may take them very far afield.

"It can not be denied that in some cases the plain meaning of an Act of Parliament has been changed by a course of judicial decisions, each going a little and a little further, so that at length the Courts have adopted a construction widely different from that which would, but for such interpretations, have been put upon the plain intent of the words. In all such cases you are to take into consideration, not merely the words of the Act of Parliament, but the decisions on them, which may be said to have been all but imported into the words of the Act, so that the Act is to be construed with reference to such decisions." (Lord Chancellor Cottenham in the case of the *Earl of Waterford's Claim*, House of Lords Cases, 6 Cl. & Fin. 133, 172.)

Nevertheless, it is the duty of all courts to avoid, if possible, an interpretation of a statute which would reduce a sincere effort on the part of the legislature to ameliorate social conditions and promote the welfare of the people to a mere stage play with the chief actor omitted.

"We ought not to create a *casus omissus* by interpretation save in some case of strong necessity. . . . Fry, L. J., properly says, 'No *casus omissus* can be admitted, or, I should rather observe, ought to be created.'" (Lord FitzGerald in *Mersey Docks and Harbour Board v. Henderson Brothers*, [Law Rep. 1888] 13 App. Cas. 595, 607, 608.)

"Whenever the case is clearly within the mischief, the words must be read so as to cover the case if by any reasonable construction they can be read so as to cover it, though the words may point more exactly to another case; this must be done rather than make such a case a

*casus omissus* under the statute." (Cleasby, B., in *Scott v. Legg,* [Law Rep. 1876-77] 2 Exch. Div. 39, 42.)

To accomplish this purpose the meaning of words may be expanded (*Barlow v. Ross,* [Law Rep. 1890] 24 Q. B. D. 381), or limited and restricted (*In re Brockelbank,* [Law Rep. 1889] 23 Q. B. D. 461), or words may be eliminated (*Stone v. Mayor, &c., of Yeovil,* 45 L. J., n. s., 657), or others substituted (*Rex v. Vasey,* [Law Rep. 1905] 2 K. B. D. 748), or necessary words may be supplied. In delivering his judgment in the House of Lords in the case of *Langston and others v. Langston and others,* 2 Cl. & Fin. 194, Lord Brougham made use of the following language:

"There are two modes of reading an instrument; where the one destroys and the other preserves, it is the rule of law and of equity, following the law in this respect (for it is a rule of common sense, which I trust is common to both sides of Westminster Hall) that you should rather lean towards that construction which preserves, than towards that which destroys. *Ut res magis valeat quam pereat* is a rule of common law and common sense; and much the same principle ought surely to be adopted where the question is, not between two rival constructions of the same words appearing in the same instrument, but where the question is on so ready an instrument as that you may either take it verbally and literally, as it is, or with a somewhat larger and more liberal construction, and by so supplying words as to read it in the way in which you have every reason to believe that the maker of it intended it should stand; and thus again, according to the rule *ut res magis valeat quam pereat,* to supply, if you can safely and easily do it, that which he *per incuriam* omitted, and that which instead of destroying preserves the instrument; which, instead of putting an end to the instrument and defeating the intention of the maker of it, tends rather to keep alive and continue and give effect to that intention." (p. 243.)

"Maxwell on the Interpretation of Statutes" is a standard work by the late Sir Peter Benson Maxwell, formerly chief justice of the Straits Settlements and Legal Administrator in Egypt. It is quoted by all the

courts of Great Britain. Chapter IX is devoted to the topic "Modification of the Language to Meet the Intention," and presents a multitude of decisions supporting and illustrating the following text:

"Where the language of a statute, in its ordinary meaning and grammatical construction, leads to a manifest contradiction of the apparent purpose of the enactment, or to some inconvenience or absurdity, hardship, or injustice, presumably not intended, a construction may be put upon it which modifies the meaning of the words, and even the structure of the sentence. This may be done by departing from the rules of grammar; by giving an unusual meaning to particular words; by altering their collocation; by rejecting them altogether; or by interpolating other words." (p. 319.)

The American cases enunciating the same principles are too familiar to require citing. The English authorities have been referred to and quoted from because the judicial problem of the interpretation of statutes is precisely the same in Great Britain as it is in the United States and is solved in precisely the same way.

It is not necessary to subject the language of the statute under consideration to any drastic treatment to arrive at its meaning. The title declares that the act is "An act creating a State School of Mines and Metallurgy." Section 1 declares that a school of mines and metallurgy for the state of Kansas is "hereby"—that is, by the act—created. In the judgment of the legislature, therefore, it provided all the means and all the agencies necessary to realize the creative purpose. It is perfectly true, as the regents point out, that they are charged with supervision and control of the school after it has been established, but it is not true, even according to the most literal reading of the act, that they have no function to perform until the school has been established. Section 8 provides that "for the purpose of carrying out the provisions of this act" a sum of money is appropriated. The very first provision of the act is for locating and establishing the school at Weir. Under section 9 no warrant can be drawn upon the state

treasurer for any part of the appropriation except upon verified vouchers duly itemized and approved by the regents. Every item of expenditure made in establishing the school must have the confirmation of the regents. It is not meant by this that sections 8 and 9 grant authority to the regents to establish the school. Section 8 provides funds and section 9 provides a way to procure such funds from the state treasury. But section 9 makes any expenditure in furtherance of the legislative purpose impossible without the sanction of the board of regents, so that they have in fact absolute dominion over the creation of the institution, attaching with the initial step taken toward its establishment. There was, therefore, no thought in the legislative mind of an arbitrary distinction, such as the regents make, between supervision and control in establishing the school and supervision and control in conducting it. There was no thought of having some one to build and equip the ship and bring it alongside the pier and then to have the regents come aboard and take charge of its navigation; and relieved of this blind the meaning of section 6 is too manifest to be misunderstood. The statute delivered the legislative creation to the board of regents in a nascent state and placed it, as a separate and independent institution of learning, and one of the colleges of the state, under their complete supervision and control. Already there were in the state educational boards and boards. Another independent school was needed, but not another board of regents, so this school, to be established at Weir, together with the necessary funds for the purpose, was committed to the board of regents of the State University. This board was already a body corporate, with power to sue and be sued, make contracts and hold and transfer property, real and personal, for the University, and the new college was simply included within its jurisdiction.

The conclusion from the foregoing is that the duty of instituting and managing the school of mines created

by the act of 1911 was imposed upon the regents and that the plaintiff has a special interest in the performance of that duty which qualifies him to maintain this suit.

The regents say that their delay in acting has not been for the purpose of thwarting any expression of the legislative will, but rather that they might be informed as to their duties. Therefore the order is that unless effective measures be taken within 20 days to 'establish the school the writ will issue, the plaintiff, however, to recover his costs.