No. 25,136.

STATE OF KANSAS, ex rel. CHARLES B. GRIFFITH, as Attorney-general, *Plaintiff*, v. JONATHAN M. DAVIS, as Governor; FRANK J. RYAN, as Secretary of State; NORTON A. TURNER, as Auditor; R. NEILL RAHN, as Adjutant General; BEN S. PAULEN, as Lieutenant Governor; CARL R. WHITE, as Director of Compensation, *Defendants.*

### SYLLABUS BY THE COURT.

1. SOLDIERS' COMPENSATION LAW—*Soldiers, Sailors and Marines Who Were Members of Regular Army, Navy or Marine Corps Entitled to Compensation.* Under section 1, chapter 200, Laws of 1923, soldiers, sailors and marines who were members of the regular army, navy or marine corps of the United States, although they became such prior to the declaration of the world war, April 6, 1917, are entitled to compensation, if otherwise qualified under the act.

2. SAME—*Members of Officers' Training Camps, Who Afterwards Became Veterans of The World War Entitled to Compensation.* Also, under section 1, chapter 200, Laws of 1923, members of officers' training camps conducted after the declaration of war, who afterwards became veterans of the world war, are entitled to compensation during the time they served in such training camps.

3. SAME—*Cadets in West Point Military Academy and in Naval Academy at Annapolis, Who Became Veterans of The World War, Entitled to Compensation.* Persons who entered the United States Military Academy at West Point and the Naval Academy at Annapolis and from such institutions became veterans of the world war, are entitled to compensation under chapter 200, of the Laws of 1923.

4. SAME—*Duties of Compensation Board Administrative and Ministerial Only —Cannot Make Rules Amending or Modifying Statute.* Under section 4 of chapter 200, of the Laws of 1923, the duties of the compensation board are administrative and ministerial and under the authority given by such section, the board may make reasonable and necessary rules for the dispatch of its business. It may not, however, make rules which amend or which have the effect of amending or modifying the statute.

5. SAME—*Compensation Board May Not Limit Time for Which Veterans May Be Compensated—Veterans Entitled to Compensation to Proclamation of Peace, July 2, 1921.* Held, further, that the statute provides that compensation shall be paid "the sum of one dollar for each day of his or her entire service," and that the compensation board cannot limit the time for which veterans may be compensated, nor compel veterans to show that they could not sooner have ended their service. Such veterans are entitled to compensation to the date of their discharge, until the end of the war which, according to the proclamation of peace, was July 2, 1921:

6. SAME—*Compensation Fund Insufficient to Pay in Full—Veterans Entitled to Share in the Fund Should Be Paid Pro Rata Therefrom.* The fund of

$25,000,000, voted by the people of Kansas and appropriated by the legislature of the state of Kansas to pay compensation to world war veterans is a trust fund for all veterans of the world war who come within the provisions of chapter 200, of the Laws of 1923, and being a trust fund, if it is insufficient to pay all who come within its provisions, the equitable rule of proratable distribution should be applied thereto and all world war veterans, entitled to participate in the fund, should be paid *pro rata* therefrom.

Original proceeding in quo warranto. Opinion filed July 18, 1923. Judgment for plaintiff in part and for defendant in part.

*Charles B. Griffith,* attorney-general, *John F. Rhodes, Dennis Madden, W. C. Ralston,* assistant attorneys-general, and *Frank McFarland,* of Topeka, for the plaintiff.

*Frank Doster, J. E. Addington, George T. McDermott, Thomas Amory Lee, A. M. Harvey, Robert Stone,* all of Topeka, *Lewis A. Hasty,* of Wichita, and *Lee Bond,* of Leavenworth, for the defendants.

*Carl R. White,* of Topeka, *pro se.*

*S. B. Amidon, S. A. Buckland, H. W. Hart,* and *Glenn Porter,* all of Wichita, for certain intervening petitioners.

The opinion of the court was delivered by

HOPKINS, J.: This is an original proceeding in quo warranto which calls for a construction of the provisions of chapter 200, Laws of 1923, providing compensation for veterans of the world war.

The title of the act is: "An act relating to compensation for veterans of the world war."

Section 1 reads as follows:

"The state of Kansas acknowledges its indebtedness to, and promises to pay to each person, who was a resident of the state of Kansas at the time of his entering the service, and who served in the world war in any branch of the army, navy, or marine corps of the United States prior to November 11, 1918, and who was honorably discharged therefrom, the sum of one dollar per day for each day of his or her entire service, which compensation shall be in addition to all pay and allowances made by the United States government."

Section 2 provides that the governor, secretary of state and state auditor are authorized and directed to issue bonds of the state of Kansas in a sum not exceeding $25,000,000, to provide funds for the purpose set out in section 1.

Section 3 provides a tax levy to pay the interest on the bonds and the principal thereof, as they become due and makes appropriation of the funds so raised for that purpose.

Section 4 is as follows:

"There is hereby created a board consisting of the state officers named in section 2 hereof, and the adjutant general of the state, who are hereby charged with the administration of this law, and who shall, within thirty days after the taking effect of this act, make, establish and publish rules and regulations providing for the proof of claims under this act, and for the method of payment of the same; and they are hereby authorized in the general administration of this law, to establish other rules and regulations."

Five general questions are presented:

1. Are regular soldiers, sailors and marines who were members of a branch of the regular army, navy and marine corps prior to the declaration of the world war, April 6, 1917, entitled to participation in the compensation provided by section 1 of the act?

2. Are members of officers' training camps, conducted after the declaration of war, entitled to compensation under the acts for the time they were members of such training camps?

3. Are persons who entered the United States Military Academy at West Point and the Naval Academy at Annapolis, and from those places became veterans of the world war, entitled, under the act, to compensation?

4. Is the rule prescribed by the state board of compensation limiting the compensation of eligible claimants to the fund to June 30, 1919, valid or a proper exercise of discretionary power of the board under section 4 of the act?

5. It being conceded that the fund already voted by the people and appropriated by the legislature is insufficient to pay all claims in full, whether the equitable rule of paying each claimant his *pro rata* share should be invoked?

The questions will be considered in their order.

1. The plaintiff contends that regular soldiers, sailors or marines who were in the service of the United States prior to the declaration of war are not beneficiaries of the act and should be excluded from participation in the compensation awarded; that the regulars who enlisted in the military, naval or marine corps service prior to the declaration of war were not moved to enlist because of the world war but because of the profession, its emoluments, promotions and stations; that the regulars did not sustain a loss of occupation and calling because of the war; that, having enrolled as regulars, the war was only an event of their service; that, because of the war, they obtained additional emoluments, promotions and honors which they never would have obtained had it not been for

The State, *ex rel.*, v. Davis.

this event in their service; that the compensation act was not intended for their benefit. On the part of the defendants it is contended, not only that the plain intent and meaning of the statute includes the regular soldier, but that there were good and sufficient reasons which moved men through the purest patriotism throughout the entire struggle between the European armies, and before the declaration of war by the United States, to enter the service for the impending conflict, clearly discernable. We need not here discuss such reasons or motives which then actuated men. Those who desire will find such questions fully discussed in recent histories of the world war. (See, Simonds' History of the World War and Reference History of the War, New International Encyclopedia.) Attention to the statute is sufficient. Its language discloses a clear, plain and unmistakable meaning. It is not ambiguous or lacking in definiteness or preciseness. The act relates to compensation for veterans of the world war. It includes any person who was a resident of the state of Kansas at the time of his entering the service, who served in any branch of the army, navy or marine corps of the United States in the world war and who was honorably discharged. No strained construction of its provisions is necessary. The language conveys no hidden meaning. There is no discrimination against volunteers, drafted men, men in the regular army, national guards, or any branch of the army, navy or marine corps. It makes no distinction as to manner in which the person entered the service, whether inducted voluntarily, drafted or commissioned in any branch of the army, navy or marine corps of the United States. All were engaged in the same laudable enterprise. They relinquished the pursuits of peace and safety for those of privation and danger. When the legislature and the people came to make provision for their compensation, they did not distinguish between regular army men and those in other branches of the service.

2. It is contended by the plaintiff that the provisions of the National Defense Act, relating to officers' training camps, do not warrant the payment of compensation to those who served in the training camps during such service; that the status of such persons under the compiled statutes of the United States, is that of citizens; that they were only preparing to enter service, and that, until they acually did so, they cannot be regarded as members of the army, navy or marine corps of the United States, and consequently, not

18—114 KAN.

entitled to compensation under the provisions of the act under consideration. We are here giving consideration to the intention of the legislature and the electors of Kansas when they provided the compensation. We find no language in the act or elsewhere indicating an intention of the legislature or of the people of Kansas to exclude the training camp soldiers of the world war from compensation for the time spent in the camps. Ample reasons for these men entering the camps at the time should not now be overlooked.

Shortly after the outbreak of the war the president declared that eventually this country must participate in the salvation of the civilization of the world; that it was the duty of young men to prepare themselves. About the same time Major General Leonard Wood advocated the establishment of military training camps for the instruction of the youth of the land against the day when the United States must enter the war. Such camps were established. The secretary of war, acting under the authority of the National Defense Act of June 3, 1916, established training camps to train men to officer the troops of the United States during the emergency. Men of special fitness, physically, mentally and educationally, were appealed to on patriotic grounds to leave their civil occupations, their professions and businesses and enlist for this training. Hundreds of Kansas men, in response to these appeals, volunteered on this basis, left their homes and civil occupations, were accepted and entered these camps. On arrival at the camps they were checked in, issued complete military equipment, assigned to companies, placed in barracks and, each took the following oath:

"I hereby acknowledge that I have enlisted for a three months' course of instruction at the training camps for reserve officers and candidates for commission in the army of the United States, to be held at ——— or at such other places as may be designated by proper authority, commencing ———, 1917, and I agree to obey all rules and regulations prescribed by proper authority for the government of said camps. I further agree to accept such commission as may be tendered to me by the secretary of war; and I do solemnly swear (or affirm) that I will bear true faith and allegiance to the United States of America, and that, during the period of said camp, unless sooner discharged by competent authority, I will obey the orders of the president of the United States and of the officers appointed over me according to the rules and regulations established by the secretary of war."

It is said that the military discipline at the training camps was the strictest encountered anywhere in the service. All who entered immediately lost their status as civilians and assumed a military status. They lost their constitutional right of trial by jury; were

subject, under all circumstances and at all times, to military control. They were deprived of their liberty for infractions of military rules or orders without any civil trial. They could not leave the camps or withdraw from the service except upon authority of the camp commander, in each case, for cogent reasons, the sufficiency of which were judged by military authority. The soldier had no option and was at all times obligated to accept whatever commission was offered him. The option as to whether he should remain in the service of the government was vested in the government of the United States and not in him. During service in the training camp he performed the same duties as other soldiers. To all intents and purposes they were doing service as much as those enlisted in other branches. In a great majority of cases those who enlisted in the training camps were commissioned and remained in the service during the war. It is also urged that these men did not go to the camps solely by reason of the emergency but that they were moved, at least, in part, by selfish motives. The legislature and the electors of this state did not predicate the paying of compensation upon motive of entering the service. Who is now able to analyze the conflicting emotions which moved men in those stirring times? It is said that the highest mortality occurred among the junior officers, those likely to be selected from the training camps. How then are we able to say that these men acted with a selfish motive when they voluntarily abandoned their peaceful pursuits, bade their families goodbye and set out on war's uncertain adventure? They are entitled to participate in the fund for the time served in the training camps.

3. The question is presented, whether persons who entered the United States Military Academy at West Point and the Naval Academy at Annapolis, and from there became veterans of the world war, are entitled to compensation under the act. There appears to be no question but that cadets in training at West Point are recognized as being in the regular army of the United States and that cadets at Annapolis are understood to be in the navy. (Act of June 3, 1916, 39 U. S. Stat. at Large, ch. 134, §§ 1, 2, p. 166; act of June 4, 1920, 41 U. S. Stat. at Large, ch. 227, §§ 1, 2, p. 759; *United States v. Watson*, 130 U. S. 80; *United States v. Cook*, 128 U. S. 254.)

It is also conceded by the parties to this action that cadets in attendance at the United States Military Academy at West Point and the Naval Academy at Annapolis are members of the army

and navy of the United States. We are therefore of the opinion that cadets in either institution who were citizens of Kansas and who served in the world war are entitled to compensation under the act.

4. The question is presented, whether it is within the power of the compensation board to fix a date (June 30, 1919) limiting the time for which compensation will be allowed those who were in the service, and if not within the power of the board so to do, whether the board may establish a rule placing the burden of proof on the applicant to show that he could not sooner have retired from the service. Whatever authority the compensation board may have is given by section 4 of the act. It may be said that the rules which the board may make for the effective exercise of their power and for the discharge of their official duties are administrative and ministerial. They are made for the accomplishment of the business with dispatch. The board is not empowered to make rules which amend or which have the effect of amending the statute nor to modify its terms in any degree. The statute provides that compensation shall be paid "the sum of one dollar for each day of his or her entire service." It prescribes no limit to the compensation and no date on which it should cease. It states neither a beginning nor an ending for such service, but says that those who entered the world war prior to November 11, 1918, shall be entitled to compensation. The world war had a legal beginning and ending. For some specific purposes it might be considered as ending on a specified date, but, unless otherwise specified, it began on the declaration of war and ended at the date of the proclamation of peace. The two dates are April 6, 1917, and July 2, 1921. (Joint Resolution of Congress, act of July 2, 1921, Fed. Stat. Ann. 1921, supp., p. 68.) We are of opinion, with reference to the establishing of a rule requiring applicants to show that they could not sooner have ended their service, that the language of the statute which states clearly that the applicant is entitled to pay for each day of his entire service, precludes authority on the part of the board to require any such showing. The date of the applicant's discharge is sufficient.

5. It is conceded by the parties to this action that the fund of $25,000,000 voted by the people and appropriated by the legislature will not be sufficient for the purpose intended. This is indeed a regrettable situation, one for which the best possible solution must be found. It is a general policy of courts of equity to distribute assets proratably among all the creditors. One or more

may not obtain preference or priority over the others. The $25,-000,000 voted by the people and appropriated by the legislature, is a trust fund for all veterans of the world war who come within the requirements of the act. It would not be just to pay one veteran all that is due him and another nothing, nor to pay one in full and another in part only. The statute is framed on equitable principles. It is designed to do a public duty to those who served their state and country in time of peril. The application of the equitable rule of payments between debtor and creditor should govern here as in any case of the insufficiency of funds. This rule was laid down at an early date and has been consistently applied to the present time. Under the circumstances the rule of equity requires a prorating of the fund in order that there may be equality of distribution among those entitled to participate. A moral duty requires that the available fund be extended to the fartherest possible degree and that the next convening legislature take all necessary means to provide for whatever deficiency may be found to exist. It would be manifestly unjust to pay some of the claims in full at this time and compel other worthy veterans to wait for their proportionate part until provision for the balance can be made by another legislature. The circumstances require the payment of every veteran of as large a per cent of his claim as possible and as soon as humanly possible. It will, therefore, be the duty of the board to prorate and pay the claims of the applicants for as large a per cent of the amount due as may be safe in order that every possible claimant entitled to participate may receive his just proportion. The board should also designate some reasonable time in the future within which applicants may file and complete their claims and then, when all claims have been properly considered, make a further payment of the balance remaining in the fund.

Judgment for plaintiff in part and for defendant in part.

Burch, J. (concurring): Section 1 of the world war veterans' compensation act uses the most widely inclusive terms: "each person"—"who served in the world war"—"in any branch of the army, navy, or marine corps"—"each day of his or her entire service." It was evidently deemed wise not to make discriminations, and application of the plain words of the statute according to their ordinary signification solves all the questions presented without resort to interpretation, except the one relating to training-camp men.

The judge advocate general of the United States has ruled as follows:

"A civilian attending such a camp, so far as his relationship to the military service is concerned, is in the situation of a student who may later graduate into the military service as an officer, but he does not acquire a military status until he is actually commissioned. . . .

"This office is of opinion that the authorization given by section 54 of the act of June 3, 1916 (39 Stat. 166, 194), to the secretary of war to prescribe the terms of enlistment of those attending the reserve officers' training camps, must be held to mean no more than that the secretary of war is authorized to fix the conditions under which the candidates should attend such camps, to determine the terms of their engagement, or enrollment, which words are synonymous with the word enlistment when used in the general sense. In the full military sense such candidates were, however, not enlisted men, nor did they serve in the military forces of the United States."

In making this ruling, the judge advocate general was not interpreting the Kansas statute, and the question we have to decide is, whether the legislature and the people had in mind a technical, legal conception of the constitution of the army of the United States, or a practical conception of a state of affairs. Section 1 of the National Defense Act of 1916 provides as follows:

"The army of the United States shall consist of the regular army, the volunteer army, the officers' reserve corps, the enlisted reserve corps, the national guard while in the service of the United States, and such other land forces as are now or may hereafter be authorized by law." (39 U. S. Stat. 166.)

Section 54 provides for training camps. The judge advocate general speaks of training-camp candidates as civilians. The opinion of the court demonstrates that they were not civilians in the sense that their pursuits were those of civil life. They gave up that status and acquired another, under and by virtue of a military law. Their occupations were military in fact, just as much as the occupation of the professional soldier. They formed an organized body of men constituting a special resource, power and strength for war, wholly distinct and entirely segregated from the citizenry, and so, within the purview of the world war veteran's compensation act, were land forces authorized by law.

The petition states the action is brought under the declaratory judgment law, to settle a controversy by judgment declaring proper disbursement and distribution of the world war veterans' compensation fund. The opinion of the court properly states the twenty-five million dollars voted by the people and appropriated by the legislature is a trust fund and, referring to distribution, speaks of the available fund and the balance remaining in the fund. While

the subject is not discussed in the briefs, in my opinion the judgment rendered necessarily requires further declaration upon two subjects: What constitutes the fund, and who gets the money?

Chapter 209 of the Laws of 1923 provides for creating a fund in the state treasurer's office to be known as the soldiers' compensation fund, to which all money realized from the sale of bonds shall be credited. That is merely a fiscal regulation, and in my judgment it should be declared the premium derived from sale of compensation bonds is a part of the compensation fund.

Chapter 208 of the Laws of 1923 provides for deposit of compensation funds in banks which agree to pay interest on the deposits. In my judgment, it should be declared the interest thus earned becomes part of the compensation fund.

Should these declarations be made, we have available to pay veterans of the world war twenty-five million dollars, plus premium derived from sale of bonds, $173,000, plus interest which may be earned while the fund is in process of administration. Do the veterans get all of it, or only part of it? It has developed the total fund will not be enough to pay them in full. Must their claim be further discounted to the extent of cost of paying them their money?

Section 6 of article 11 of the constitution reads as follows:

"No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article."

One of the provisions and restrictions contained in the preceding article, which relates to debts for extraordinary expenses and public improvements, is that the purpose for which the debt is created shall be specified in the law. In this instance the law submitted to the people for approval and approved by them at the election of 1922, reads as follows:

"Section 1. The state of Kansas acknowledges its indebtedness to, and promises to pay to each person, who was a resident of the state of Kansas at the time of his entering the service, and who served in the World War in any branch of the army, navy or marine corps of the United States prior to November 11, 1918, and who was honorably discharged therefrom, the sum of one dollar per day for each day of his or her entire service, which compensation shall be in addition to all pay and allowances made by the United States government.

"SEC. 2. The governor, secretary of state, and state auditor are hereby authorized and directed to issue bonds of the state of Kansas in a sum not exceeding twenty-five million dollars, to provide funds for the purposes set out in section 1 hereof: . . ."

The purpose set out in section 1 is to pay a dollar a day to each veteran for the period of his service in the world war, and not to pay the cost of running the business of the state of Kansas. The legislature has apparently taken a different view. By chapter 209 of the Laws of 1923, already referred to, five thousand dollars were appropriated to pay expenses until bonds could be sold. Provision was then made for payment out of the compensation fund in the treasury of all expenses incident to administration of the compensation law. In my judgment, the provision is void. The legislature cannot divert a penny of compensation money from the destination fixed by the law which the people approved.

The state is not a creditor collecting a debt, and so entitled to take out of proceeds expense of collection. It is not settling up an estate for the benefit of creditors, and so entitled to take from proceeds expense of administration. It is not converting its own property into a special fund, and so entitled to turn into the fund net proceeds, as in the case of sale of school lands. The state is discharging its own promise to pay its own debt, and can no more charge to its creditors expense of disbursing the money than it could if it were liquidating an ordinary contract debt.

The pay roll of the force for administration of the compensation fund is now in the neighborhood of ten thousand dollars per month. The total cost of administering the fund is likely to consume a large part of the premium on the bonds. Cost of administration would pay the claims of many veterans in full.

In my opinion, the subjects discussed are too intimately related to the matters decided to be ignored.

JOHNSTON, C. J., concurs in this special concurrence.

HARVEY, J. (dissenting in part): I dissent to that part of the opinion holding that the civilians in the training camps are entitled to compensation. The statute makes the compensation payable to those who served "in any branch of the army, navy or marine corps of the United States." Necessarily, the question arises when anyone presents a claim for compensation as to whether or not he served in the army, navy or marine corps of the United States.

What constitutes that body is governed by the laws of the United States. Those in the training camps were composed of three classes: Officers of the regular army, enlisted men of the regular army, and civilian students who were candidates to become members of the officers' reserve corps. In *United States v. Rider*, 43 Sup. Ct. Rep. 382, the history of the organization of the training camps is thus stated:

"In 1915, the war department, responding to a popular agitation for preparedness, on its own initiative and without legislative authority, organized training camps, where civilians were given military instruction. Those who attended were required to pay transportation and subsistence, to buy their uniforms, and to serve without pay. Legislative authority was given for these camps in section 54 of the National Defense Act of June 3, 1916 (39 Stat. 194; Comp. St. § 3071b). This provided transportation, uniforms, and subsistence, but no pay. The Army Appropriation Act of August 29, 1916 (39 Stat. 648), gave funds for future camps for the fiscal year 1917, and authorized reimbursement for transportation and subsistence to persons who had attended camps prior to the act of June 3, 1916. See 23 Comp. Dec. 217. Such was the state of legislation when the war began, April 6, 1917. At this time, civilians and enlisted men of the regular army and of the national guard in federal service were being sent to training camps to become officers. The civilians received no pay. The enlisted men received the pay of their respective grades. By the Appropriation Act of May 12, 1917, (40 Stat. 69, 70) an appropriation of more than $3,000,000 was made to enable the secretary of war to pay to civilians designated by him for training as officers not exceeding $100 a month as pay, provided they would agree to accept appointment in the officers' reserve corps in such grade as might be tendered." (p. 383.)

The oath taken by the civilian students at these camps quoted in the majority opinion, is not the oath of a soldier, and they were not regarded by the officials of the war department as being a part of the army. Each time the question has come up for decision before the judge advocate general it has been so held. In the opinion by the judge advocate general of November 12, 1917, the question arose as to whether or not the three months in training camp applied upon army service for the purpose of the computation of longevity pay and it was there held the time spent in the training camp could not be regarded as time served in the army. It was said:

"Certainly service in a training camp under an enlistment having for its sole purpose training for entrance into the Army of the United States as an officer and not binding the enlisted man to any service unless accepted as an officer cannot be said to be service in the accepted sense of enlisted service." (p. 220.)

In the opinion of the judge advocate general of March 26, 1918, it was said:

"A civilian died while in attendance at a training camp as a candidate for a commission in the Army of the United States. Apparently the body was shipped home by the government. *Held,* that there is no legal authority for the reimbursement by the government of the funeral expenses incurred by the family of the deceased. The regulations covering enlistment of civilians for service in civilian training camps (Spec. Reg. No. 49, 1917) contain no provision for payment of burial expenses of any candidate who may die while under such enlistment. Nor are such civilian candidates on the 'army active list' as that term is employed in the provision contained in the sundry civil appropriation act (40 Stat. 105, 130) for payment of funeral expenses of officers and enlisted men on the army active list and reimbursement of individuals who have borne such expenses. For the same reason it has been decided that a civilian member of the training camp who died while under training could not be viewed as an officer or an enlisted man within the meaning of the act of May 11, 1908 (35 Stat. 106, 108) as amended by the act of March 3, 1909 (35 Stat. 732, 735) providing for payment to the widow or other person previously designated by decedent for that purpose of an amount equal to six months' pay at the rate received by such officer or enlisted man at the date of death." (Vol. 2, 1918, p. 213.)

It will be noted under the statute that these people were candidates for positions in the officers' reserve corps. I find nothing in the statutes or in any of the decisions or rulings of the war department or of the courts to indicate that these candidates were subject to court-martial or that they were deprived of any of their civil rights. If this were a legislative question, as distinct from a judicial one, some reasons might be suggested as to why they are not entitled to this compensation. Those who attended the training camps in 1917 received pay at $100 a month, while the regular soldiers drew $30; there were many more applications for an opportunity to attend the training camps than could be accommodated. But we are not deciding a legislative question. The question before us is a judicial one and simply resolves itself into the question: Were these persons a part of the army? If so, they are entitled to compensation, and if not, they are not entitled to compensation. When we break away from this rule of interpreting this statute, we do the persons for whom the compensation was intended an injustice by taking money away from them and giving it to persons to whom it does not belong, and permit ourselves to be guided by considerations other than those which should control us. Especially is this true since the fund is inadequate.

The State, *ex rel.*, v. Davis.

## OPINION ON REHEARING.
### (Filed August 4, 1923.)

#### SYLLABUS BY THE COURT.

1. SOLDIERS' COMPENSATION BILL—*"Fund to be Prorated."* The court adheres to its former decision rendered in *State, ex rel., v. Davis,* ante, p. 270, that the available compensation fund be prorated among all persons lawfully entitled to payment therefrom unless and until practical means are provided to pay every lawful claimant in full.

2. SAME—*Expenses of Administration Payable from Proceeds of Bonds.* The reasonable expenses incident to the administration of the soldiers' compensation acts may be lawfully paid out of the funds available from the sale of the bonds, under chapter 209 of the Laws of 1923.

3. SAME—*Legislature May Authorize Additional Bond Issue Without Further Submission to Popular Vote.* The constitutional provision forbidding the state to incur a debt in excess of a million dollars without a vote of the people was satisfied by section 1 of chapter 255 of the act of 1921 submitted to, acknowledged and approved by the people at the general election of 1922 and the legislature, without further submission to popular vote, may authorize an additional bond issue to cover any insufficiency in available funds to pay the state's debt incurred by section 1 of the compensation act.

The opinion of the court was delivered by

HOPKINS, J.: An application has been filed to modify the judgment rendered July 18, and to decide additional questions.

1. Shall the judgment be modified by eliminating therefrom the requirement that if available funds are insufficient to pay all lawful claims in full, they be prorated, so that all veterans entitled thereto may receive their proportionate part thereof?

2. Whether the reasonable expenses incident to the administration of the soldiers' compensation act may be lawfully paid out of the funds available from the sale of the bonds?

3. May the legislature, without further submission to popular vote, authorize an additional bond issue to cover any insufficiency in available funds to pay the state's debt incurred by section 1 of the compensation act?

The questions will be disposed of in their order.

1. The court is asked to modify that part of its judgment which provides for a prorating of available funds among all veterans lawfully entitled to participate. In support of the application it is stated that a shortage of the available funds has not been admitted and defendants are unable at this time to say there will be a

shortage. This is a mistake. On the previous submission it was admitted that there would be a shortage. Plaintiff asserted that if all who served during the world war, if otherwise qualified under the act, were entitled to compensation, there would be a shortage of $4,000,000. Defendants answered that if all entitled to do so, submit their claims, and the average of those already filed is maintained, it will require $32,688,000 to pay the compensation.

Assuming a shortage, defendants in one brief contended:

"There is no hard and ·fast rule of law which prevents prorating of the fund should it fall short. On the contrary the rule of equity requires a. prorating of the fund, . . . Suppose this court were charged with the administration of the fund. Would your honors hestitate for a moment to order an equal distribution in the event of an apparent shortage? The equitable rule of the application of payments between debtor and creditor governs in this case as in any other case of the insufficiency of funds."

In another they state:

"It will soon be determined whether there is money enough to go around. If not, what then? Two alternatives are open:

"(1) Pay the first ones claiming in full and the others nothing. A man lives now in California. He is late filing his claim on that account. Some county official makes a mistake and all claims from that county must go back for correction. Many Kansas boys are in far-away hospitals, trying to fight their way back, and their claims are delayed. These men get nothing, and the able-bodied, alert man gets all.

"(2) Make a 75 per cent payment now, treating all alike. Defer the final dividend until all claims are in. By then the legislature of 1925 will make up the deficiency and all can be paid their last 25 per cent. If the legislature doesn't do it, then, at least, there is no injustice done to any."

Defendants stated on the present submission that there had already been filed 68,000 claims averaging $400 each, making a total of $27,200,000. It is not made clear to the court why the judgment should be modified in such a way as to permit the defendants the extraordinary power of paying same in full, which would have the effect of denying others all or part that may be due them. Under the circumstances, the announced rule of prorating is the only equitable one that can be devised. Should no further funds be provided, the $25,000,000 already appropriated, should be made to extend as far as possible toward the payment of all lawful claims. Every veteran of the world war who qualifies under the provisions of chapter 200 of the Laws of 1923 is entitled to his or her proportionate part thereof. If the legislature, which is representa-

tive of all the people, shall in its wisdom provide additional funds so that all may be paid in full the necessity for prorating will cease and the fixing of a date when all claims shall be filèd and completed will be obviated.  The court adheres to its. decision that there must be an equitable and absolutely impartial prorating of the compensation fund among all the persons lawfully entitled to payment, unless and until practical means are provided to pay every lawful claimant in full.

2. A question has arisen as to whether the reasonable expenses incident to the administration of the soldiers' compensation act may be paid out of the funds available from the sale of bonds. The controversy involves the validity of chapter 209 of the Laws of 1923, section 1 of which is as follows:

"There is hereby created a fund in the state treasurer's office to be known as the soldiers' compensation fund, and the money realized from the sale of the bonds authorized to be issued by section 2 of the act entitled 'An act relating to compensation for veterans of the world war' shall be paid into the state treasury to the credit of the fund to be known and designated as the soldiers' compensation fund and all of said fund is hereby appropriated to the uses of said act, and acts supplemental thereto, out of which shall be made disbursements of all sums allowed to claimants as compensation and all sums necessary to pay all the expenses incident to the administration of the act entitled 'An act relating to compensation for veterans of the world war,' including the salaries and expenses of the director of compensation and district examiners, as provided by law; and all necessary expenses of the board or members thereof created in section 4 of the act entitled 'An act relating to compensation for veterans of the world war': *Provided,* That for the purpose of paying expenses that may be incurred prior to the sale of the bonds provided for herein, there is hereby appropriated out of any money in the state treasury not otherwise appropriated the sum of five thousand dollars."

Consideration of the soldiers' compensation act is necessary.  As chapter 255 of the Laws of 1921, it was submitted to the people of Kansas and adopted by the requisite constitutional majority at the general election of 1922.

Section 1 reads:

"The state of Kansas acknowledges its indebtedness to, and promises to pay to each person, who was a resident of the state of Kansas at the time of his entering the service, and who served in the world war in any branch of the army, navy or marine corps of the United States prior to November 11, 1918, and who was honorably discharged therefrom, the sum of one

dollar per day for each day of his or her entire service, which compensation shall be in addition to all pay and allowances made by the United States government."

Section 2 reads:

"The governor, secretary of state, and state auditor are hereby authorized and directed to issue bonds of the state of Kansas in a sum not .exceeding twenty-five million dollars to provide funds for the purpose set out in section 1 hereof: *Provided,* That such bonds may be issued in installments from time to time in such amounts and upon such terms as may be necessary to meet the payments of compensation as the same are allowed; such bonds shall bear interest not to exceed 5½ per cent; such bonds or the portion thereof at any time issued shall be made payable at the fiscal agency of the state of Kansas in twenty-five equal annual installments, the first of which shall be payable one year from the date of issue, and the last of which shall be payable twenty-six years from the date of issue, and which bonds shall be sold to the highest bidder and for not less than par."

Section 3 provides a tax levy to pay the interest on the bonds and the principal thereof as the bonds become due and makes appropriation of the funds so raised for that purpose.

Section 4 reads:

"There is hereby created a board consisting of the state officers named in section 2 hereof, and the adjutant general of the state, who are hereby charged with the administration of this law, and who shall, within thirty days after the taking effect of this act, make, establish and publish rules and regulations providing for the proof of claims under this act, and for the method of payment of the same; and they are hereby authorized in the general administration of this law, to establish other rules and regulations."

In *State v. Davis,* 113 Kan. 4, 213 Pac. 171, where the validity of the compensation act was questioned, it was said:

"If chapter 255 of the Laws of 1921 is uncertain or indefinite in any particular, that uncertainty and indefiniteness can be removed by subsequent legislation not inconsistent with that act." (Syl. ¶ 4.)

It is contended that the constitutional restriction which relates to debts for extraordinary purposes requires that the purposes for which the debt was created should be specified in the law; that it was so specified as being an indebtedness of the state to the veterans of the world war of one dollar for each day's service; that the legislature cannot divert any part of the money appropriated by the compensation act from the destination fixed by law which was approved by the people; that the expense of distributing the fund is the state's expense—the state's business—and that the legislature cannot divert any part of the fund to pay the cost of run-

ning the business of the state, and therefore, that the attempt of
the legislature, in chapter 209 of the Laws of 1923, to divert a part
of the fund for the purpose of disbursing it, is invalid.

Whether chapter 209 of the Laws of 1923 is valid, depends on
whether the expense of administration may come out of the fund
provided by the compensation act. Various matters should be con-
sidered in arriving at a conclusion.

In *State, ex rel., v. Kelly,* 71 Kan. 211, 811, 813; 81 Pac. 450, it
was said:

"In construing a statute resort should first be had to the language of its
provisions. If it be found that a clear and definite meaning may be ascer-
tained by giving the words their common signification, the court has no choice
or discretion to exercise; its only duty is to declare the result of its investiga-
tion. An observance of this rule requires the court to consider every part of
the act, and, if possible, to discover from the whole the legislative intent.
Another requisite rule of construction is that where it is doubtful which of two
objects the legislature had in view, one being within its authority and the other
not, the language must. be given a broad and liberal interpretation, and an
endeavor made to apply the act to the object within the legislative authority.
All presumptions are resolved in favor of the constitutionality of a statute, and
when doubt is entertained its language should be given that construction
which will sustain it. (*The People, ex rel. Sinkler, v. Terry,* 108 N. Y. 1, 14
N. E. 815; *Miller v. Dunn,* 72 Cal. 462, 14 Pac. 27, 1 Am. St. Rep. 67; *City of
San Diego v. Granniss,* 77 id. 511, 19 Pac. 875; *Mauldin v. City Council,* 42 S.
C. 293, 20 S. E. 842, 27 L. R. A. 284, 46 Am. St. Rep. 723; *Wesger v. Taylor,*
39 Kan. 754, 18 Pac. 911.)"

In construing a statute the court may look to the history of the
times, to the causes which induced its enactment and to the object
sought to be attained. The intent of the lawmakers should govern
if it can be ascertained, if the provisions of the statute do not con-
travene the constitution. While the construction of a statute is a
judicial and not a legislative function, a legislative construction is
entitled to weight. Antecedent, contemporary and subsequent action
of the legislature and the condition of affairs when the statute was
enacted may be considered in construing it. (See, *State, ex rel., v.
Kelly,* supra, and cases cited.) The legislature which enacted chap-
ter 209, Laws of 1923, was largely the same legislature that enacted
chapter 255 of the Laws of 1921. The senate was comprised of the
same membership and approximately one-third of the members of
the house were the same in 1923 as in 1921. We may consider the
fact that the legislature of 1923, by enacting chapter 209 placed a

construction upon chapter 255 of the Laws of 1921 to the effect that the reasonable and necessary expenses of administering the compensation act should be paid out of the funds derived from the sale of the bonds. "In determining the intent of the legislature, the court is not limited to a mere consideration of the words employed, but may properly look to the purpose to be accomplished, the necessity and effect of the statute under the different constructions suggested." (*City of Emporia v. Norton,* 16 Kan. 236, and cases cited.) Courts will ordinarily yield to a practical construction of a statute placed upon it by the legislative and executive departments unless satisfied that such construction is repugnant to the plain provisions of the constitution. (*State, ex rel., v. Lord,* 28 Ore. 498; 31 L. R. A. 473.) Here both the legislative and executive departments proceeded upon the theory that the reasonable expenses of administration might properly be paid out of the funds accumulated from the sale of the bonds.

It is not necessary to here detail the various measures enacted, the requirements thereof, and the efforts made to put the compensation act into effect. The legislature could not have estimated, with any degree of accuracy, what amount of money would be required to efficiently administer the fund. No person was able to foresee what force of assistants, clerks, stenographers and typists or what equipment might be necessary for a performance of the work nor the length of time required in which to accomplish it. Under the circumstances it was natural and expedient for the legislature to make provision for the payment of the expenses out of the fund accumulated from the sale of the bonds with the expectation that if the $25,000,000 appropriated was not sufficient to pay all lawful claims in full, and also pay the cost of administration, the legislature would, in due time, make the necessary appropriation to cover the deficiency. The human machinery developed in Kansas for the disbursement of the fund is said to be the most efficient and economical of any yet devised by the several states for the disbursement of compensation to world war veterans. This, however, is not a matter with which the court has to do.

When the validity of a statute is questioned, or when its language is not clear, it should be given such a construction as will not deprive the persons interested of a substantial right. Here those entitled to payment from the compensation fund would have been de-

prived of a substantial right, they would have been compelled to wait an unreasonable and indefinite length of time for payment, if the compensation board had not proceeded with promptness, by all available means, to the work of paying the compensation to those entitled to it. A statute which will admit of two interpretations, one valid and the other invalid, should receive the interpretation sustaining its validity. It has often been said that, "Courts should never give construction to a statute which will render it unconstitutional if any other construction is reasonably possible." (See *Hunter v. Coal Company*, 245 Iowa, 175, 154 N. W. 1037, L. R. A. 1917 D 15 and cases cited.) It is the duty of the court to construe as a whole and harmonize, if possible, all valid legislation on the same subject and a construction making all provisions valid should be adopted if it can be done without violating constitutional limitations. (*Dinuzzo v. State*, 85 Neb. 351, 123 N. W. 309, 29 L. R. A., n. s., 417.)

The compensation act acknowledges the indebtedness of the state of Kansas to the veterans of the world war in the sum of one dollar per day for each day of service and provides funds to pay the amount. Section 2 authorizes the issuance of $25,000,000 of bonds to provide funds for the purpose set out in section 1, and in a proviso to section 2, direction is given to issue installments of the bonds from time to time as may be necessary to meet the payments of compensation as they are allowed. In section 4 an administrative board, consisting of the officers named in section 2 and the adjutant general are charged with the administration of the law. The words in the sections referred to, make no specific mention of payment of expenses in administering the fund, but expense must be incurred as a necessary incident to the disbursement of the funds. The purpose of the statute cannot be effectuated without the incident of expense, therefore, when in section 1, the statute creates the debt of one dollar per day and states the purpose of the state to pay that sum, and in section 2, authorizes bonds for the purpose set out in section 1, and in section 4, directs the compensation board to carry out the provisions of the act, it, by implication, authorizes the payment of expenses as a necessary means to effectuate the purpose. Every incident necessary to accomplish the purpose of section 1 inheres in the act itself.

"Wherever a power is given by statute everything lawful and necessary to

19—114 KAN.

the effectual execution of the power is given by implication of law." (*State v. A. C. L. R. Co.*, 56 Fla. 617, 645, 32 L. R. A., n. s., 639.)

"It is elementary that the grant of specific power, or the imposition of a definite duty upon any person or court, confers, by implication, the authority to do whatever may be necessary in order to execute the power conferred, or to perform the duty imposed, and the implied power is as much a part of the statute as if it were written into the body of the act itself." (*Brown v. Clark,* 102 Tex. 323, 333, 116 S. W. 360, 24 L. R. A., n. s., 670.)

In *The Mayor et al. v. Sands,* 105 N. Y. 210, 218, it was said:

"It is a well established principle that statutes containing grants of power shall be construed, so as to include the authority to do all things necessary to accomplish the object of the grant, and to enable the donee of the power to effect the purpose of the act. Domat expresses the idea as follows: 'All laws necessarily bear with them all the powers or incidents necessary to carry out their intention.' (Sedgwick Const. and Stat. Laws, p. 245.) Sedgwick says, 'When a statute commands an act to be done, it authorizes all that is necessary for its performance.' (Sedgwick, 228.) Potter's Dwarris states the rule to be: 'In statutes, incidents are always supplied by intendment, in other words, whenever a power is given by statute, everything to the making of it effectual is given by implication.'" (See, also, *Brown County v. Barnett,* 14 Kan. 627; *State, ex rel., v. Younkin,* 108 Kan. 634, 196 Pac. 620; *State, ex rel., v. Wooster,* 111 Kan. 830, 208 Pac. 656; *In re Neagle* (Cal.), 5 L. R. A. 78, affd. 135 U. S. 1; Endlich on Interpretation of Statutes, § 418; *Bateman v. Colgan,* 111 Cal. 580; *M'Culloch v. State of Maryland,* 17 U. S. 4.)

In *Young v. Regents of State University,* 87 Kan. 239, 124 Pac. 150, it was said:

"It is the duty of the court to interpret a statute designed to ameliorate social conditions and promote the general welfare of the people of the state in such a way that it may be upheld and not nullified, if it be possible to do so, and in such a way that the intention of the legislature may be carried out to the fullest extent. A *casus omissus* should not be acknowledged if by any reasonable interpretation the statute may be read to avoid it." (See cases cited in *Young v. Regents;* also, *Railway Co. v. Cowley County,* 103 Kan. 681, 176 Pac. 99.)

We conclude that the expense of administering the fund is a necessary incident to the disbursement of the fund itself, and falls within the rule that whenever a power is given by statute, everything necessary toward making it effectual is given by implication. The reasonable expenses incident to the administration of the soldiers' compensation act may be lawfully paid out of the funds available from the sale of the bonds.

3. The question is propounded whether the legislature may, without further submission to popular vote, authorize an additional bond

issue to cover any insufficiency in available funds to pay the state's debt incurred by section 1 of the compensation act.

The compensation act, enacted by the legislature of 1921, was submitted to the people for adoption or rejection under sections 5, 6 and 7 of article 11 of the constitution. An examination of those constitutional provisions is proper.

Section 5 reads:

"For the purpose of defraying extraordinary expenses and making public improvements, the state may contract public debts; but such debts shall never, in the aggregate, exceed one million dollars, except as hereinafter provided. Every such debt shall be authorized by law for some purpose specified therein, and the vote of a majority of all the members elected to each house, to be taken by the yeas and nays, shall be necessary to the passage of such law; and every such law shall provide for levying an annual tax sufficient to pay the annual interest of such debt, and the principal thereof, when it shall become due; and shall specifically appropriate the proceeds of such taxes to the payment of such principal and interest; and such appropriation shall not be repealed nor the taxes postponed or diminished, until the interest and principal of such debt shall have been wholly paid."

Section 6 reads:

"No debt shall be contracted by the state except as herein provided, unless the proposed law for creating such debt shall first be submitted to a direct vote of the electors of the state at some general election; and if such proposed law shall be ratified by a majority of all the votes cast at such general election, then it shall be the duty of the legislature next after such election to enact such law and create such debt, subject to all the provisions and restrictions provided in the preceding section of this article."

Section 7 reads:

"The state may borrow money to repel invasion, suppress insurrection, or defend the state in time of war; but the money thus raised shall be applied exclusively to the object for which the loan was authorized, or to the repayment of the debt thereby created."

It is contended that $25,000,000, the sum named in the law is the limit to which bonds may be issued, without a further vote of the people; that section 1 of the act cannot be considered separate and apart from the rest of the law; that section 2 can only be construed as a restriction on the acknowledgment of indebtedness contained in section 1; that the people, in voting on the compensation question, were voting for a bond issue of only $25,000,000.

The reasons and purposes of a statute and the language used therein must be considered in its interpretation. A construction inconsistent with the reason or purpose should not be given. A reason-

able interpretation should be given in order to accomplish the object sought to be reached. It must always be construed with reference to the object in view. (*Young v. Regents,* supra, and cases cited; *Gleason v. Sedgwick County,* 92 Kan. 635, 141 Pac. 584; 36 Cyc. 1110, and cases cited; 26 Am. and Eng. Ency. Law, 602.)

The language of section 1 of the act is definite, clear and all inclusive.

"The state of Kansas acknowledges its indebtedness to, and promises to pay to each person . . . who served in the world war in any branch of the army, navy or marine corps . . . one dollar per day for each day of his or her entire service."

The language contains neither exceptions nor discriminations. The plain words of the statute, according to their ordinary signification, solve the question absolutely unless restricted by other provisions of the statute.

Courts will not construe language so as to invalidate an act where it is fairly susceptible of a construction consistent with validity, but will give effect to a legitimate legislative purpose, plainly indicated, if it can reasonably be done. Section 2 authorizes the issuance of $25,000,000 of bonds to provide funds for the purpose set out in section 1, and in a proviso, direction is given to issue installments of the bonds from time to time as may be necessary to meet the payments of compensation as they are allowed. It also contains other directions of an administrative nature. Sections 3 and 4 deal with matters of administration. The provisions of sections 2, 3 and 4 are all of a character which may reasonably be said to have been enacted by the legislature and adopted by the people for the purpose of carrying out and making effective the acknowledged indebtedness specified in section 1. If the language of section 2 providing for the issuance of $25,000,000 of bonds is a restriction on the language of section 1, then the state did not mean what it said when it acknowledged its indebtedness and agreed to pay one dollar for each day's service. If that view should be adopted, the language should have been, "that the state acknowledges its indebtedness and agrees to pay one dollar for each day's service, provided $25,000,000 is sufficient for the purpose, and if it is not sufficient, then such part of one dollar per day as the total fund of $25,000,000 will pay, and provided, further, that if the $25,000,000 exceeds the amount necessary to pay one dollar for each day's service, then, each person so

The State, *ex.rel.*, v. Davis.

entitled, shall receive an additional compensation over and above the one dollar per day." The contention does not appear sound. Did the legislature intend and did the people vote $25,000,000 as compensation to those entitled under the act, whether it was more or less than one dollar for each day's service? Or, was one dollar for each day's service the debt acknowledged, and the $25,000,000 an estimate of the amount required to pay the indebtedness? We think the latter.

A similar situation arose in the state of Washington. $11,000,000 was there provided in an enabling act which was submitted to the people. The bonds were insufficient, and the question of authority to issue additional bonds was submitted to the supreme court of that state. It was held that additional bonds could be issued because the state had incurred a definite and fixed obligation or an obligation that could be ascertained and determined, and therefore, there was authority to provide for the payment without another referendum. The court there said:

"When the act was passed it was impossible to ascertain the exact number of veterans who would be entitled to the additional compensation or the exact amounts due to those entitled to it. Those matters, however, were matters of public record, to be determined according to the records of the government of the United States, and when determined the amount necessary to be raised by the sale of bonds was possible to determine. It is a general rule that that is certain which is capable of being ascertained and made certain. The debt, therefore, is already contracted by the legislature . . . The legislature, the people approving at the referendum, contracted the indebtedness and the evident intention of the legislature and the people was that every veteran entitled to the amount fixed by the act should be provided for." (*State, ex rel. Hart, v. Clausen,* 117 Wash. 260, 264, 265; 201 Pac. Rep. 30.)

We are here placing an interpretation on an act of the legislature which was submitted to the people. The ballot was in the following form:

"CONSTITUTIONAL QUESTION SUBMITTED—BALLOT.

"To vote in favor of any question submitted upon this ballot, make a cross X mark in the square after the word 'Yes'; to vote against it make a similar mark in the square after the word 'No.'

"Shall the following be adopted? .

| An act relating to compensation for veterans | Yes. ☐ |
| of the World War. | No. ☐" |

The people voted for compensation for veterans of the world war. The act specifically states that the compensation shall be one dollar

for each day's service. The $25,000,000 specified in section 2 of the act was an estimate by the legislature of the amount necessary to pay the indebtedness created by section 1. If inadequate, the legislature may take necessary means to provide for the inadequacy. Had it been more than was required no one would have contended that under the plain provisions of section 1 any veteran was entitled to more than one dollar for each day's service. It is not within the province of this court to say what the legislature shall do, but if it shall be ascertained that there is a shortage of funds to pay each lawful claimant in full, the legislature may adopt such means as lies within its power to make up the shortage. If funds are available it may appropriate the necessary amount. Or, it may levy a tax to raise the amount. Or, it may authorize the issuance of additional bonds for the purpose.

The letter and spirit of the statute are in agreement. We are convinced that it was the intention of the legislature, in enacting the compensation act, to provide payment of one dollar for each day's service, as specified in the plain language of section 1; that the law proposed the creation of the debt therein specified, which was submitted to the people and by the requisite constitutional majority, acknowledged and adopted.

We conclude that the constitutional provision forbidding the state to incur a debt in excess of a million dollars without a vote of the people was thereby satisfied, and the legislature, without further submission to popular vote, may authorize an additional bond issue to cover any insufficiency in available funds to pay the state's debt incurred by section 1 of the compensation act.

BURCH, J. (dissenting): I dissent from the second paragraph of the syllabus and the corresponding portion of the opinion.

On the occasion of the former submission, I expressed the opinion expense of administering the compensation fund could not be charged against the dollar a day the beneficiaries of the fund were promised. The argument contained in the majority opinion specifically directed to sustaining a contrary view, seems to me to be so transparently fallacious, and seems to me to be so completely refuted in the third subdivision of the opinion, I am content to let it pass with only a word of comment.

We have for consideration a statute consisting of two parts: first,

The State, _ex..rel.,_ v. Davis.

an acknowledgment of debt and a promise to pay, and second, means and method of payment. The acknowledgment and promise are definite—a specific sum for a specific time, a dollar a day for each day of service. The fund provided in the latter part of the statute is inadequate to pay the debt. The majority opinion properly holds specification of an inadequate sum to pay the debt does not constitute a restriction on the amount of the debt, because the plain words of the first part of the statute, given their ordinary signification, do not admit of restriction.

We also have for consideration another statute, whereby the debtor seeks to take out of the fund at its disposal to pay its debt, the expense necessarily involved in making payment. The words of that statute are just as plain and unambiguous as the words of the earlier statute:

"Out of which shall be made disbursements of all sums allowed to claimants as compensation and all sums necessary to pay all the expenses incident to the administration of the act entitled 'An act relating to compensation for veterans of the world war.'"

So, we have words of one statute, not subject to restriction, which the legislature has attempted to restrict. The first statute required and received the approval of the people, who, because the words are clear, made their meaning unmistakable. Whose will shall prevail, that of the people, or that of the legislature? Shall veterans of the world war be paid a dollar a day for their periods of service, or something less than a dollar a day?

The majority opinion begins its argument that the veterans may be paid something less by quoting the following settled rule for the interpretation of statutes:

"In construing a statute resort should first be had to the language of its provisions. If it be found that a clear and definite meaning may be ascertained by giving the words their common signification, the court has no choice or discretion to exercise; its only duty is to declare the result of its investigation."

As indicated, the majority of the court are able to demonstrate the language of the first statute is so definite that the court has no choice or discretion to exercise. The debt and the promise to pay admit of no qualification. Definiteness of the second statute is so positive it is not even debated. Therefore, the two statutes are irreconcilably repugnant. Instead of acknowledging the repugnancy, and declaring the second statute void as a restriction on the first,

the majority opinion undertakes to treat a simple promise to pay a dollar a day for a definite number of days as ambiguous and doubtful in meaning. In what respect the words are uncertain and confusing to the mind is not pointed out, and the opinion moves at once to misapplication of rules of interpretation which may not be resorted to except in case of ambiguity.

In my judgment, this debt of high honor may not be scaled down by judicial interpretation, legislative interpretation, or bonus-board interpretation, and my hope is, the legislature about to assemble will forbear to make penurious use of the power which the majority opinion concedes to it.

JOHNSTON, C. J., concurs in the foregoing dissent.

MARSHALL, J. (dissenting from third paragraph of syllabus and corresponding part of the opinion): I am very sorry that I cannot agree with the court in all its conclusions.

The law adopted by the people provides for the issue of bonds "in a sum not exceeding twenty-five million dollars," to provide funds to pay the debt of one dollar a day which the state acknowledges it owes and which it promises to pay. No other bonds are authorized and the legislature is not given power by that law to authorize any other issue of bonds. Twenty-five million dollars is named in the law as the limit to which bonds may be issued. That amount only was appropriated by the people for the payment of the debt.

Section 1 cannot be considered separate and apart from the rest of the law. The whole law must be examined to ascertain the meaning of any part of it. When so examined, section 2 should be considered as a restriction on the acknowledgment of indebtedness contained in section 1. Twenty-five million dollars was the total amount that was voted by the people. The statute reads, "in a sum not exceeding twenty-five million dollars." This limits the amount of bonds that may be issued under that law. If this construction of the law be not correct, why name any amount as a limit to the bonds that may be issued under it? Why does not the law say that bonds shall be issued in such sums as may be necessary to pay the one dollar a day? The sum named is a restriction on the total amount of bonds that may be issued under the law, not merely a restriction on the amount that the issuing officers may put out.