- No. 27,836.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, etc., *Plaintiff*, v. ROY L. BONE, Bank Commissioner, etc., *Defendant*.

(266 Pac. 85.)

SYLLABUS BY THE COURT.

1. BANKS AND BANKING—*Depositors' Guaranty Fund—Liquidation and Distribution of Fund.* In an original action in mandamus to compel the bank commissioner to turn into cash the fragmentary assets of the bank guaranty fund and distribute them among the holders of certificates on that fund, the status of that fund considered, its insolvency recognized, and the problems involved in its distribution stated.

2. SAME—*Depositors' Guaranty Fund—Liquidating Insolvent Banks.* The findings and conclusions of the commissioner of this court touching the methods of the bank commissioner and his general receiver in liquidating insolvent banks summarized and stated.

3. SAME—*Liquidation of Viola State Bank.* Under the circumstances stated in the opinion, the Viola State Bank was not fully liquidated at the time the commissioner of this court concluded and submitted his report.

4. SAME—*Liquidation and Right to Priority Under Guaranty Fund.* The objections to the liquidation and payment of final dividends of the Farmers State Bank of Washington and of the State Savings Bank of Leavenworth considered and not sustained; and the claims of holders of certificates on the guaranty fund, growing out of the failure of the Peoples State Bank of Hanover, to priority of right to payment out of the guaranty fund denied.

5. SAME—*Liquidation of Insolvent Banks—Manner of Liquidation.* The practice of expediting the liquidation of insolvent banks and ending their active receiverships so as to reduce expenses and conserve their assets, as outlined in the opinion, was primarily one governed by sound business principles and within the discretion of the bank commissioner and the general receiver, and neither violation of law nor injustice is discerned therein.

6. SAME — *Liquidation of State Savings Bank of Leavenworth.* Special objections to the liquidation of the State Savings Bank of Leavenworth based upon the report of auditors employed under legislative authority considered and not sustained.

7. SAME—*Rights of Banks Liquidated on Same Day.* The liquidation of the American State Bank of Cherryvale and of the State Savings Bank of Leavenworth having been completed on the same day they must be placed on an absolute equality as to the payment of certificates on the guaranty fund issued to depositors of those banks, and if the guaranty fund is not sufficient to meet all such certificates, when it comes their turn to be paid

Banks and Banking, 7 C. J. pp. 482 n. 64, 484 n. 74. Costs, 15 C. J. pp. 103 n. 45, 104 n. 47. Time, 38 Cyc. pp. 315 n. 48, 317 n. 59.

State, ex rel., v. Bone.

according to the statutory order of priority, whatever funds are available must be prorated among all such certificate holders.

8. SAME—*Rights of Holders of Certain Certificates.* The rights of holders of certificates on the guaranty fund growing out of the failure of the State Bank of Geuda Springs and out of the failure of the Farmers State Bank of Quenemo considered, and held not to depend upon questions presented by this record.

9. SAME—*Method of Prorating Guaranty Fund.* The arguments advanced in behalf of the depositors of the Citizens State Bank of Lane, for the pro-rating of the guaranty fund among the holders of certificates to depositors of all fully liquidated banks, considered, and not sustained.

10. SAME—*Liquidation—Certifying Balances by Receiver.* The failure of the receiver to certify the balances as of the time each insolvent bank was fully liquidated considered, and held not to affect the rights of certificate holders to the statutory order of priority of payment of their claims out of the guaranty fund.

11. SAME—*Depositors' Guaranty Fund—Meeting Expense of Litigation.* The problem of meeting the necessary expenses attendant on this litigation considered and disposed of as outlined in the opinion.

Original proceeding in mandamus. Opinion filed April 7, 1928. Writ allowed.

*William A. Smith,* attorney-general, for the plaintiff.

*Robert Stone, George T. McDermott, Robert L. Webb, B. L. Johnson,* all of Topeka, *Lee Bond,* of Leavenworth, *Ed. T. Hackney,* of Wellington, *Noah L. Bowman,* of Garnett, *R. P. Evans,* of Manhattan, *E. C. Wilcox, J. Howard Wilcox,* both of Anthony, *F. R. Lobaugh, J. R. Hyland,* both of Washington, *Charles L. Hunt, Frank C. Baldwin, C. J. Putt,* all of Concordia, *H. W. Hart, Glenn Porter, Enos E. Hook* and *Clyde Hudson,* all of Wichita, for the defendant and the depositors.

The opinion of the court was delivered by

DAWSON, J.: This proceeding chronicles another chapter of litigation concerning the bank guaranty law and presents a question concerning the proper method of distributing its fragmentary assets among its many creditors, in view of the admitted and familiar fact that the bank depositors' guaranty fund is insolvent, and the methods devised by the statute for the rehabilitation of the fund have virtually ceased to function.

The case presented takes the form of mandamus, but in effect it calls for the distribution of a trust fund. The state's application for mandamus and relief pertinent thereto alleges that many banks whose deposits were protected by the bank depositors' guaranty fund have failed in the last few years; that many of these failed

banks have been liquidated; that the sums due depositors from the guaranty fund aggregate millions of dollars; that the cash in the guaranty fund is practically exhausted; that the withdrawal from membership of several hundred solvent banks which heretofore contributed to the fund has cut off its sources of rehabilitation; that the bank commissioner has in his possession bonds and other securities of the par value of $897,964.59 forfeited to the guaranty fund by voluntary withdrawal of banks from membership or otherwise.

The state further alleges that aside from certain miscellaneous claims against the guaranty fund aggregating about $160,000, which sum may be affected by pending litigation, the business affairs of some twenty-five insolvent banks whose deposits had been protected by the guaranty fund have been wound up and the depositors thereof holding certificates against the guaranty fund amounting to $1,648,498.36 are entitled to payment, but that the defendant bank commissioner has ceased to execute the law, and he should be required to sell the bonds and securities in his possession and pay out the proceeds to the certificate-holding depositors in the order of priority prescribed by the statute as far as the assets of the guaranty fund will reach.

In his answer and return to the alternative writ the bank commissioner admits most of the allegations of the plaintiff's application, and alleges that the number of banks contributing to the guaranty fund has shrunk to 93; that the last assessment imposed on this number produced only $5,450.21; that the next assessment will yield only a negligible amount; that after making every reasonable allowance for the amounts that may yet be realized from the assets of failed banks there will be left valid and subsisting claims against the guaranty fund approximating $6,000,000; that the maximum assessment which can be levied on the constantly diminishing number of contributing banks will be wholly insufficient to pay even a substantial fraction of the interest on the lawful outstanding claims against the fund, and—

"The fund is becoming more insolvent each day with no reasonable prospect of any improvement in the situation.

". . . Defendant states that he is not only willing but anxious to make payment to the holders of the guaranty certificates, but that such serious and grave questions have arisen as to the proper priority of the various banks.
. . .

"For further return, the defendant states that the principal reason why he has not issued his checks is because he is unable to determine the proper priority of the holders of the certificates in the various banks. . . .

State, *ex rel.*, v. Bone.

"The defendant states that the funds available for distribution will pay in full, with interest, the holders of certificates of a number of banks, but there will be a large number who will receive nothing on their certificates. That it therefore becomes a matter of vital interest, particularly to those banks which have a chance only to participate in the fund, that the certificate holders of no other bank be improperly paid ahead of them."

The bank commissioner's answer and return further narrates at length the complex and difficult questions of fact and of law confronting him, and alleges—

"That his office is an administrative office; that he has no power to subpœna witnesses or otherwise explore and determine questions of fact or of law; and that all of the claimants have a right to a judicial determination of such judicial questions.

"The defendant further alleges that he is advised that the holders of each and every certificate of every bank named in the exhibit attached has a proper interest and a right to be heard in the determination of the question of priority of every other bank ahead of the bank in which he holds a certificate. That there are thousands of persons holding such certificates, and that each has a right to, and many are asserting their right to have such questions determined by a court of competent jurisdiction."

The bank commissioner concludes with a prayer that this court take jurisdiction of the cause and protect him from being subjected to a multiplicity of actions by the thousands of individual and rival claimants holding certificates against the guaranty fund; that a commissioner be appointed to hear all persons concerned and to make findings of fact and conclusions of law concerning the order of priority of payments so far as the assets of the guaranty fund will reach.

The plaintiff joined in the bank commissioner's application for the appointment of a commissioner. On admission of parties that the liabilities of the guaranty fund were far in excess of its assets, this court by a separate order directed the bank commissioner to sell securities in his hands pertaining to the fund, and ordered—

"(1) That S. C. Bloss, esquire, of Winfield, Kansas, be and he is hereby appointed commissioner of this court for the purpose of hearing the evidence that may be adduced by the parties, and other parties interested, and for the purpose of making findings of fact and conclusions of law, all of which he shall report to this court. For the purpose hereof, he is hereby empowered to issue subpœnas for witnesses and compel their attendance and to compel the production of such books, documents and papers as in his judgment may be material to the issues in this cause.

"(2) The said commissioner is directed particularly to ascertain the order of priority in which banks, which at the time of their failure were members of

the bank depositors' guaranty fund, were finally liquidated within the meaning of section 9-204 of the Revised Statutes of Kansas of 1923 as amended. If the holders of guaranteed certificates in banks which were members of the guaranty fund at the time of their failure, and which are not listed in exhibit A to the return, desire to be heard upon the question of their participation in the guaranty fund, the commissioner is directed to hear such evidence and to make his report thereon.

"(3) The commissioner is hereby directed to give notices by publication in the official state paper, and in a paper published in each county in which a failed bank is located, and preferably in the town in which such bank is located, advising the holders of guaranteed certificates of the pending of this litigation, and that he will at a time and place to be specified in such notice, hear the evidence of any party interested upon the question of such priority, and give to every party interested an opportunity to examine the witness of every other party. Such notice shall be published for three consecutive weeks, and the time of such hearing shall not be less than ten days after the publication of the last notice.

"(4) The commissioner is directed to employ a competent reporter for the purpose of reporting and transcribing the evidence produced before him.

"(5) The commissioner is directed not to hear evidence upon the question of whether a deposit is or is not guaranteed under the terms of the depositors' guaranty law.

"(6) The court finds that the necessary costs and expenditures of this action are a proper charge against the fund being administered; the commissioner herein appointed is authorized to certify to the defendant the costs of publication notice, the cost of reporting the evidence, traveling expenses, and other items of costs incurred by the commissioner; and upon such certificate the defendant is directed to cause to be paid out of the guaranty fund such items, and take the commissioner's receipt therefor.

"(7) During the pendency of this action all persons are restrained from instituting any action to compel the defendant to approve the certificate of the receiver of the failed bank, or to issue his check upon the guaranty fund."

Accordingly the commissioner of this court published the following notice in the press of the state, and particularly in all counties where failed guaranteed banks had existed:

"Notice to Owners of Bank Guaranty Fund Certificates.

*"To All Owners and Holders of Certificates on the Bank Depositors' Guarantee Fund:*

"By order of the Supreme Court of Kansas, you are hereby notified:

"(1) That certificates on the bank depositors' guaranty fund have been issued to the depositors of all failed guaranteed banks, and that the amount of such certificates is far in excess of the money and bonds in the fund.

"(2) That the bank guaranty law provides that the certificates shall be paid in full as long as there are funds available, and the order in which they shall be paid depends on the order in which the failed guaranteed banks were finally liquidated.

State, *ex rel.*, v. Bone.

"(3) That a controversy exists as to the order in point of time in which the affairs of the several failed guaranteed banks were finally wound up, and that the supreme court has appointed the undersigned, as its commissioner, to hear the evidence and arguments upon that question.

"(4) That I will commence such hearing in the supreme court room, at the statehouse, in Topeka, at ten o'clock a. m., Tuesday, the 2d day of August, 1927, and continue such hearings until all interested parties have an opportunity to be heard.

"(5) No pleadings or written objections are necessary. At the hearing the receiver of all failed guaranteed banks will state the facts within his knowledge as to the affairs of each bank, the time when the last dividend was paid to creditors, the last asset collected, the last claim paid, and other pertinent facts. He will be subject to cross-examination; his books will be available, and any pertinent evidence offered will be received.

"(16) Whether particular certificates of guaranty are valid, or whether particular persons are entitled to certificates, are questions which will not be heard. The question to be determined is the order, in point of time, in which the several failed guaranteed banks were finally liquidated.

"The determination of the supreme court in this case will adjudicate such questions as to all parties interested.

"If the owners of the guaranty fund certificates have reason to believe that the bank on which their certificates are issued has been finally liquidated and should have priority over other failed guaranteed banks, they should appear in response to this notice and assert such claim. Otherwise such owners will be forever barred from asserting that the order of priority of the banks which will be made in this case is erroneous.

"Hereof take notice and govern yourself accordingly.

"Done at Topeka, Kan., this 29th day of June, 1927.

"S. C. Bloss, *Commissioner.*

"Attest: D. A. Valentine, *Clerk of the Supreme Court.*

"(Seal.) By E. E. Clark, *Deputy.*"

Pursuant thereto the commissioner of this court commenced to hold hearings in the supreme court room on August 2, 1927, at which time counsel for depositors of many failed banks appeared, and these hearings continued from time to time until all evidence available was submitted and all desiring to be heard had presented their arguments. Printed and written briefs of counsel for several claimants and for groups of claimants were also submitted for the consideration of the commissioner; and eventually he prepared and submitted his findings of fact, together with a list of twenty-six banks which he found to be fully liquidated and whose depositors held certificates on the guaranty fund entitling them to payment. Appended thereto is a list of ten banks which are virtually liquidated, but where final dividends are not yet paid.; and this is followed by still another list of twenty-four banks now in process of

liquidation under active receiverships. Included in the commissioner's findings are explanatory summaries of the status of affairs of each failed and fully liquidated bank, which may be sufficiently understood by a reproduction of the first of the list:

"CITIZENS STATE BANK, MANHATTAN.

Date of Failure, September 19, 1921.

| | |
|---|---:|
| Capital | $50,000.00 |
| Deposits | 337,575.51 |
| Guaranty certificates | $291,478.87 |
| Total dividends paid | 262,330.98 |
| Balance due on guaranty certificates | $29,147.89 |
| Amount reserve unfiled claims | $138.42 |
| Amount reserve unpaid dividends | 978.49 |
| Balance cash on hand undistributed | 755.33 |
| Cash balance with receiver | $1,872.24 |

Date last charge for salary of assistant receiver...........November 9, 1925
Date last charge general office expense—prorated..............October, 1925
Date last asset collected................................September 3, 1925
Date last charge made to account.............................March 25, 1926
Date claims barred ..........................................June 27, 1925
Date of final dividend........................................March 1, 1925"

"1. The tag end of the notes and other assets which could not be collected in the ordinary way were sold September 3, 1925, for $651.51, six months after the final dividend was paid. The cash received from this sale is still in the hands of the receiver.

"2. The last charge made to the account was on March 25, 1926, in the sum of $14 for a publication notice."

The list of banks which the commissioner found to be completely liquidated and the amount of liabilities against the guaranty fund in consequence thereof is as follows:

| Number and name of bank. | Due from guaranty fund. |
|---|---:|
| 1-A Citizens State Bank, Manhattan | $29,147.89 |
| 2-A Lake State Bank, Lake City | 61,929.27 |
| 3-A Citizens State Bank, Harper | 40,229.15 |
| 4-A Olivet State Bank, Olivet | 20,030.00 |
| 5-A Farlington State Bank, Farlington | 7,570.25 |
| 6-A Runnymede State Bank, Runnymede | 7,241.24 |
| 7-A State Bank of Eudora, Eudora | 70,630.68 |
| 8-A Farmers State Bank, Washington | 56,791.64 |
| 9-A Halls Summit State Bank, Halls Summit | 29,181.61 |
| 10-A American State Bank, Cherryvale | 20,829.19 |
| 11-A State Savings Bank, Leavenworth | 372,815.28 |
| 12-A State Bank of Scottsville, Scottsville | 92,856.93 |
| 13-A Peoples State Bank, Hanover | 56,375.36 |
| 14-A Citizens Bank, Lane | 63,729.78 |
| 15-A Dwight State Bank, Dwight | 16,887.86 |
| 16-A Farmers State Bank, Smith Center | 72,232.28 |
| 17-A Gridley State Bank, Gridley | 60,421.67 |

State, *ex rel.*, v. Bone.

| | | |
|---|---|---:|
| 18-A | Osawatomie State Bank, Osawatomie | $95,050.92 |
| 19-A | Traders State Bank, Arkansas City | 295,525.52 |
| 20-A | Farmers State Bank, Larned | 137,489.45 |
| 21-A | Farmers State Bank, Zenda | 10,093.66 |
| 22-A | Farmers State Bank, Quenemo | Amt. in litigation |
| 23-A | Citizens State Bank, Geuda Springs | Amt. in litigation |
| 24-A | Citizens State Bank, Bartlett | 93,218.71 |
| 25-A | State Bank of Peck, Peck | 18,227.61 |
| 26-A | Exchange State Bank, Kanopolis | 27,623.96 |

To a correct understanding of the methods of winding up an insolvent bank, space must be given to a number of the commissioner's findings:

"FINDING No. 2.

"There has been in effect in the bank commissioner's office during the administration of Mr. Bone a uniform method of handling the affairs of all failed banks. The 'general receiver' maintains his office and place of business and keeps necessary records in Topeka in the office of the bank commissioner. Upon the failure of a state bank he is duly appointed and qualified as receiver and performs the duties of such office.

"There is appointed in addition to the receiver, an 'assistant receiver' or 'receiver in charge,' who stays at the place of business of the closed bank. The assistant receiver keeps the custody of the books at the place of business of the closed bank while he is active in collecting the assets. He makes collections under the direction of the general receiver and reports and transmits all sums collected to the general receiver at his office in Topeka. The deposit by the general receiver is in his name, and a record is kept at his Topeka office of all receipts and disbursements of each failed bank.

"The assistant receiver while active in making collections pays local expenses, such as rent and for clerical work, but when the general receiver determines that the receiver in charge has collected all the assets he can, and there are no further matters requiring local attention, all the books, records and correspondence relating to the liquidation of the failed bank are transmitted to the general receiver's office at Topeka and the assistant receiver is discharged. All further matters pertaining to the liquidation are handled directly by the general receiver.

"FINDING No. 3.

"In liquidating failed banks as described in finding No. 2, the general receiver does not act independently of the bank commissioner. The assets of failed banks are collected and managed under the general direction of the bank commissioner. He is advised of all collections and of all actions of the general receiver.

"FINDING No. 4.

"In the course of liquidation of the banks considered herein, the bank commissioner and general receiver, acting together, and through the agency at times of a receiver in charge, take substantially the following steps:

"(a) Controversies concerning the issuance of guaranty certificates, if such there be, are settled, and guaranty certificates issued to those entitled thereto.

"(*b*) All stock liability, including double liability of stockholders, is collected, which in the judgment of the bank commissioner and receiver may be collected.

"(*c*) All other assets, including bills receivable as they mature, are collected, which in the judgment of said officers and their attorney may be collected.

"(*d*) Such partial dividends are declared as collections warrant.

"(*e*) Claims are duly barred by publication notice.

"(*f*) Assets of no or doubtful value, and other personal and real property, are sold, and such sales approved by the district court of the proper district. Compromises of indebtedness are approved by the proper court.

"(*g*) A reserve fund is established, sufficient, in the opinion of the bank commissioner and receiver, to pay final costs of administration and unknown liabilities. Such reserve is substantially the same percentage in each case.

"(*h*) Payment of what is denominated 'a final dividend' is made, after the actions and determinations hereinabove mentioned, when in the judgment of the receiver and bank commissioner there will be no more money available to the general creditors.

### "FINDING No. 8.

"In the case of each bank shown and listed in said exhibit 'A,' from 1-A to 26-A, inclusive (22-A and 23-A being not herein considered), the bank commissioner and general receiver determined at the time the final dividend was declared that there would be no more money available to pay anything further to creditors and that substantially all assets of the bank and all of the double liabilities of the stockholders had been collected which could be collected.

### "FINDING No. 10.

"In setting aside the sums of money in reserve in the case of each bank the receiver attempted to apply as nearly as practicable a uniform rule of a certain percentage, and the amount reserved was thus dependent upon the size of the bank. The sum reserved was deemed sufficient to take care of the final administrative expense, and was made somewhat larger than such amount by reason of the fact that the bank commissioner and general receiver did not know that in law claims could be barred by a proper notice fixing a reasonable time, short of the period of the statute of limitations, until after the decision of the case of *Thompson v. Bone,* Hope Bank case, by this court, December 11, 1926. (122 Kan. 195.)

### "FINDING No. 11.

"The general receiver, upon the payment of the final dividends, in no case made a written certificate certifying all balances due on guaranteed deposits (if any exist) to the bank commissioner, but the data from which such certificate must necessarily be made, if made, appeared in the records of the failed banks in the office of the bank commissioner.

### "FINDING No. 12.

"Beginning at the time of the final dividend in the case of the Citizens State Bank of Manhattan, March 1, 1925, and in the case of each of the banks listed in exhibit 'A' and numbered from 1-A to 26-A, exclusive of 22-A and

23-A, it was determined by the bank commissioner and the general receiver that such certificate would not at the time (that is the time of the final dividend) be issued directing payment of balances from the guaranty fund.

"The reasons for this determination were that the officers were in doubt as to whether or not claims could be barred prior to the time fixed by the statute of limitations; that the bank guaranty fund was far short of being sufficient in amount to pay the balance due to depositors in all failed banks, under the charge of the commissioner, who would be entitled to payment. Certain claimants were demanding that they be paid in full. Other claimants were demanding that the amount in the guaranty fund be distributed *pro rata* among all holders of certificates, without respect to the time when the bank failed, or the time of payment of the final dividend, or of any other determining factor.

"The bank commissioner was threatened by numerous claimants that he and his bondsmen would be held liable in actions in the courts, if at the time final dividends were declared and paid he proceeded to make payment of balances due holders of certificates in such bank from the guaranty fund. He was likewise threatened with suits if he did not make such payments. On account of such facts, and his uncertainty as to the law applicable, and upon the advice of his attorney, the bank commissioner, beginning with March 1, 1925, in the case of the Citizens State Bank of Manhattan, Kan., has made no payments from the guaranty fund except where specifically directed by this court so to do.

"Finding No. 23.

"The amount found to be due on all guaranty certificates is the principal only, to which interest should be added in order to find the exact balance due thereon.

"Finding No. 24.

"I find that the allegations of the return filed by the defendant, as to the controversies which exist among the various holders of guaranty certificates, are true. There are 52,210 individuals or corporations holding certificates against the bank guaranty fund.

"Finding No. 25.

"I find that the banks (in list, 1-A to 26-A) were in fact liquidated within the meaning of the statute at the times and in the order as set out in the recommendations of conclusions of law hereinafter made."

A summary of the commissioner's conclusions of law is that it is the duty of the bank commissioner to apply the remaining assets of the guaranty fund toward the satisfaction of claims of certificate holders in the order of their priority, which in turn depends upon the priority of complete liquidation of the banks whose depositors they were; and the commissioner further concludes that—

"If the funds are not sufficient to pay in full all of the guaranty certificates of the last bank which will receive any payment, that the balance be pro-rated among all the certificate holders of such last bank."

The practical effect of these findings and conclusions is that (subject to a matter of detail to be considered later) the depositors in the first ten banks in the list set out above who hold certificates against the guaranty fund will be paid in full; that the same class of depositors of the next bank on the list, the State Savings Bank of Leavenworth, will get a few cents on the dollar and whatever sums may yet be brought into the fund from future assessments on the few remaining banks still contributing to the guaranty fund; and that the remaining holders of certificates on the guaranty fund will receive nothing—unless or until some miracle is wrought in their behalf.

With the general trend of the commissioner's findings and conclusions there is substantial accord by most of the counsel who have favored this court with briefs. However, certain positive exceptions are taken thereto which will have to be noted in detail.

Touching the specific objections to the commissioner's report as they come to hand, we note one made by counsel for the depositors of the Viola State Bank, which failed on October 31, 1921. They contend that this bank was virtually liquidated years ago and that there was no valid excuse for keeping it unliquidated so long that the guaranty fund will be exhausted before it comes their turn to be paid. A certain amount of discretion must be accorded the receiver and bank commissioner in determining when all available assets have been collected and the double liability of stockholders exhausted and nothing further in prospect can be accomplished by continuing the insolvent institution under active receivership. (R. S. 9-204.) These officers must follow the law, of course; but even administrative officers have a measure of practical discretion which they may and should exercise in the discharge of their duties. (*State, ex rel., v. Mohler,* 98 Kan. 465, 470-472, 158 Pac. 408.) The status of the Viola bank is given in the commissioner's finding No. 18:

"The only reason the Viola State Bank was not finally liquidated and final dividends paid before January 1, 1925, was by virtue of an action on behalf of the United States against the Guaranty Title and Trust Company and the Guaranty State Bank to recover upon certain registered bonds, which the cashier of the Viola State Bank had sold to the Guaranty Title and Trust Company without indorsement of the original owner of such registered bonds. After the institution of such suit the receiver of the Viola State Bank was notified on August 9, 1923, that he would be held liable if judgment was recovered against the defendants. The government prevailed in the above suit, and a suit was filed on September 16, 1925, by the Guaranty Title and Trust

Company against the receiver of the Viola State Bank in the district court of Sedgwick county to recover such sum. A demurrer to the petition was filed by the receiver on November 15, 1926, and sustained by the court March 31, 1927, and appeal taken to the supreme court, where it is now pending."

The bank commissioner and receiver appear to have acted wisely in not closing this particular receivership. That its business affairs and liabilities were not at all in shape for final liquidation has been demonstrated by subsequent events. See *Guaranty Title & Trust Co. v. Viola State Bank,* 124 Kan. 776, 262 Pac. 1037.

Decided exceptions are taken to the inferior position accorded by the commissioner to holders of certificates on the guaranty fund growing out of the failure of the Peoples State Bank of Hanover. They contend that they should take precedence over two banks placed ahead of them, the Farmers State Bank of Washington and the State Savings Bank of Leavenworth. To develop these objectors' point, so far as it relates to the Washington bank, it is necessary to reproduce the commissioner's summary and explanatory notes:

FARMERS STATE BANK, WASHINGTON, KANSAS (8-A).

Date last charge for salary of assistant receiver...................April, 1926
Date last charge general office expense, prorated...............February, 1927
Date last asset collected.......................................April 19, 1927
Date last charge made to account..............................June 2, 1927
Date claims barred ...........................................July 26, 1925
Date of final dividend......................................January 16, 1926

1. Items collected since final dividend:
    (a) May 10, 1926, Walter Wilson, stock liability.............  $100.00
    (b) June 5, 1926, Walter Wilson, stock liability..............   100.00
    (c) July 2, 1926, balance of Wilson stock liability............   200.00
    (d) Return of cost deposit December 3, 1926.................    15.00
    (e) Return of cost deposit April 19, 1927.....................    21.45

2. Payments made since final dividend as follows:
    (a) January 25, 1926, examination expense...................    48.60
    (b) February 5, 1926, Kelly Printing Co.....................     5.70
    (c) March 2, 1926, Miller Spratt Co., assistant receiver's bond,    25.00
    (d) April 8, 1926, Fred Bergen, salary and expenses..........    32.32
    (e) April 3, 1926, salary, one month, assistant receiver........   100.00
    (f) December 22, 1926, R. C. Postlethwaite, fees in Covell case,    51.00
    (g) O'Neill & Hamilton, attorney fees, June 2, 1927..........   135.00
    (h) Miller Colwell, assistant receiver's bond June 27, 1927.....    25.00
    (i) Charges made at different times since final dividend for general receiver's expense (the last charge made on February 26, 1927), aggregating.....................   210.00

3. Assets uncollected:
    (a) E. M. Baker, stock liability, reduced to judgment April 28, 1926, and in amount of...............................  1,227.50
    (b) H. Backenstoce, stock liability, reduced to judgment on April 28, 1926; amount of judgment..................  1,837.50
    (c) Richard Thomas, stock liability, reduced to judgment June 27, 1927; amount of judgment.......................  1,936.88

State, *ex rel.*, v. Bone.

It will be noted that the final dividend in the Washington bank was paid on January 16, 1926. The date of such incident is ordinarily a practical time to be considered in ascertaining when a bank is fully liquidated. The statute recognizes that there may be nominal assets which cannot be realized on by the bank's receiver within any reasonable length of time in which it would be justifiable to keep the insolvent institution unliquidated, and so it is provided that the odds and ends of assets of doubtful value may be sold or compounded by order of court, on application of the bank commissioner. (R. S. 9-130.) It appears that at or about the time the final dividend was paid the Washington bank had obtained judgments against Backenstoce, Baker and Thomas. These "assets" might have been sold by leave of court, but that was not done because it was believed they had no value. Instead, execution was issued and returned unsatisfied, according to the assistant receiver, who testified:

"Q. Have you made any personal investigation as to whether or not this [Baker] judgment was of any value? A. I have.

"Q. And what is your conclusion as to that? A. It has no value.

"Q. And what has been done with Backenstoce since this judgment? A. Execution was issued by our attorney and returned unsatisfied.

"Q. And what is your conclusion as to that? A. It has no value; Mr. Backenstoce has no property.

"Q. The transcript shows that a judgment was rendered against Richard Thomas on June 27, 1927. What has the receiver done towards the collection of that? A. Our attorneys were instructed to collect on that judgment, and nothing has been collected—been informed by the attorneys that we can expect to receive nothing on that judgment.

"Q. Have you made any personal investigation as to the determination of its worth? A. I have. . . .

"Q. When did you say you paid your final dividend? A. January, 1926.

"Q. When you paid that dividend was it your opinion that all of the assets had been realized upon that were of value? A. It was. . . .

*Cross-examination.*

"Q. Dick Thomas has always paid his obligations and affairs in this town for thirty years, hasn't he? A. Yes, I think so. . . .

"Q. You don't want to tell this court that if this judgment is finally affirmed, Dick Thomas won't pay it? A. Well, I did not know that the matter had been appealed, and I don't know what he would do. . . .

"The Commissioner: What is the amount of that judgment?

"Mr. Bond: About $1,936.88. . . .

"Q. When did you say that the final dividend was paid? A. January, 1926—January 16."

It will thus be seen that at the time the final dividend was paid

the receiver in the exercise of his administrative discretion believed that there was no prospect of collecting anything further from these judgment assets of the Washington bank, and under all the information then available there were no assets worth asking the court's permission to sell. In *Thompson v. Bone*, 122 Kan. 195, 201, 251 Pac. 178, it was said:

"Can there be a final closing up of the affairs of the bank before the full double liability has been collected, or if there are some notes or other assets of the bank which have not been collected? The receivership should not be held open and the general closing of the bank's affairs and payment to depositors from the bank depositors' guaranty fund delayed because of the inability to collect noncollectible items. . To do so would be to postpone indefinitely, and perhaps forever, the payment of the balance due depositors on their certificates in the bank depositors' guaranty fund. When all of the assets of the bank and double liability of the stockholders have been collected which, in the judgment of the receiver and his counsel and of the bank commissioner, can be collected, the bank's affairs are fully administered by the receiver for the purpose of making the payment of the balance due on guaranteed deposits."

Neither the fact that later Thomas unexpectedly did compromise and settle the judgment against him, nor that Wilson also unexpectedly paid his double liability as stockholder, is sufficient to impeach the *bona fides* of the bank's liquidation. The bank guaranty act contemplates the possibility that assets of a bank may turn up after liquidation and after the certificate-holding depositors have been paid by the guaranty fund, and provides that any such assets shall inure to the benefit of that fund. (R. S. 9-204.)

Another argument against the commissioner's finding that the Washington bank was fully liquidated on January 16, 1926, is based on the fact that various items were disbursed after that date. These were unusual, but they were made in accordance with the methodical plan followed in winding up all the insolvent banks. As a matter of business economy and to wind up all these banks as speedily as possible and thus prevent their assets from being exhausted in costs of receivership, the bank commissioner and his general receiver devised a plan of setting apart a small percentage or margin of the insolvent bank's funds as a reserve to meet belated claims, and going ahead with the liquidation without regard thereto. (See findings No. 4 [g] and No. 10, above.) This was a general practice, and seems to be justified on sound business principles. The Hanover bank itself was wound up on that basis. Although final dividend in that bank was paid on April 28, 1926, and it was considered as fully liqui-

dated on that date, yet in accord with the general plan referred to above, a reserve for unfiled claims of $400.29 and a cash balance of $297.03 technically yet remain to its credit, and charges were made against the Hanover bank as late as May and June, 1926. So if the argument advanced by the certificate holders of the Hanover bank that the Washington bank was not liquidated on January 16; 1926, were sustained, the final liquidation date ascribed to the Hanover bank itself would likewise have to be discarded. The objections to the commissioner's findings relating to the Farmers State Bank of Washington are not sustained, and his findings and conclusions in respect thereto are approved.

Counsel for the certificate holders of the Hanover bank also assail the commissioner's report in respect to the liquidation of the State Savings Bank of Leavenworth, a large institution having thousands of depositors, whose ruinous collapse subjected the guaranty fund to a heavy liability. It is contended by the Hanover depositors that the Leavenworth bank is not yet liquidated, and this argument is also based, in part, upon the fact that since January 30, 1926, the date of final dividend, certain claims against this bank have been paid from the reserve set apart to meet such contingencies. This, however, was done in pursuance of the regular method of liquidating all these banks; and, as already remarked, unless this practice is recognized as valid no bank can ever be liquidated for a certainty during any period of time reasonably determinable. (*Thompson v. Bone*, supra.) The items paid since final dividend pertained to a controversy with an assistant receiver over his claim for $900, which found its way into court, and was eventually settled for $507.29. Of course the pendency of that controversy incurred certain minor expenses and an attorney's fee, but these were met from the customary reserve. Two worthless notes of one Buchanan, which were paper assets of the bank, were not sold as the statute permits. The commissioner's explanatory comment on these notes reads:

"Assets uncollected: Notes of B. B. Buchanan, $2,500, and $84.27 reserved at sale, and no collection has been made. Advised notes are worthless."

It is not suggested that there was evidence to justify a finding to the contrary, and these matters are not of enough significance to vitiate the liquidation. Another objection to the liquidation of the Leavenworth bank as of the date of January 30, 1926, is based upon the report of special auditors employed by authority of an act of

the legislature (Laws 1925, ch. 91) to investigate receiverships of failed banks. Their report concerning the State Savings Bank of Leavenworth is an elaborate affair of many pages, with manifold abstruse tabulations of figures, which required and doubtless received due attention at the hands of the bank commissioner and his general receiver, for whose information the audit was made. The commissioner of this court did not treat the disposition of the auditors' report as one governed by a mere presumption that the bank commissioner and the general receiver had done their duty pursuant to its revelations. The general receiver, William Docking, testified:

"Q. As such receiver you had under your control the affairs of the State Savings Bank at Leavenworth, Kan.? A. Yes, sir.

"Q. Do you remember the auditors' report, or the audit being made of the affairs of that bank, sometime in April, 1925? A. Yes, sir. . . .

"Q. After that report was returned to your office, will you kindly state to the court what, if any, action was taken upon it by you and the bank commissioner, Mr. Bone? A. The report was filed with Mr. Bone, the bank commissioner, who then took it up with Mr. Griffith, who was then attorney-general. They discussed it quite fully, and I joined in the discussion, and they, Mr. Griffith and Mr. Bone, went to Leavenworth to see what data they could gather on the ground to see whether there was sufficient justification to bring a criminal suit, and after making a very full investigation they decided, while there were a great many irregularities and many changes had been done that were illegal, that no evidence of fraud was there, that fraud could not be proven in any way, and there was nothing gained by bringing any action; and we discussed it from that angle.

"Q. And you determined and decided to take no action? A. Yes.

"Q. And no action was taken. Well, I will call your attention to the fact that the report showed that one or two compromises had been made, a written petition having been presented to the district court. I will ask you if you instructed your counsel at Leavenworth to comply with the request? A. My recollection is that he did after investigation. . . .

[Counsel for Hanover certificate holders]: "No cross-examination."

There are a number of matters in the auditors' report which are singled out for discussion, and their disposition in the course of the receivership is criticized, but responsibility must be placed somewhere. The statute (Laws 1925, ch. 91) contemplated that the auditors' report should primarily be for the information of the bank commissioner, and the responsibility for taking the proper official action on whatever misdoings were revealed by the auditors' report, if any, devolved on that officer. By that express statute, as well as by general principles of law, the attorney-general is the

53—125 Kan.

bank commissioner's legal adviser, and when in the exercise of their official discretion these officers determined there was nothing revealed by the auditors' report to justify setting aside the liquidation of the Leavenworth bank in the hope of adding anything substantial to its assets, we are bound to hold that our commissioner did not err in recognizing the date of final dividend, January 30, 1926, as the final liquidation of the bank.

The next exception taken to the findings and conclusions of the commissioner of this court is lodged on behalf of the certificate holders of the State Savings Bank of Leavenworth because of the priority accorded the certificate holders of the American State Bank of Cherryvale. This matter is of prime importance to these two groups of certificate holders, because if the commissioner's report stands the Cherryvale claimants may be paid in full and the Leavenworth claimants cannot hope for more than a fractional percentage of what is their due, otherwise they will fare exactly alike. Both these banks were liquidated on the same day, January 30, 1926. The Leavenworth objectors invoke the rule that fractions of a day are disregarded, the presumption being that acts done on the same day are considered as done simultaneously, except where, as in the registry acts, they are required to be done in a certain order. Such is the general rule (38 Cyc. 314-317), and its complementary adjunct is that where legal rights turn on which of rival claimants actually were first in point of time on a particular day, the claimant who asserts priority has the burden of establishing it. In *Fabien v. Grabow*, 134 Mo. App. 193, 196, it was said:

"The rule that the court takes no notice of fractions of days is subject to exceptions, and when it is essential to justice to determine the priority of acts done on the same day, courts will receive evidence on the issue. (*Kimm v. Osgood,* supra; 8 Am. and Eng. Ency. Law [2 ed.], 742. The burden of proof rests on the party who asserts an act or event occurred prior to some other which happened on the same day, to establish what he alleges. (*Levy v. Bank,* 158 Ill. App. 88, 103.)"

The Leavenworth claimants argue that since there was no showing made on behalf of those to whom precedence is accorded to justify that priority, the Cherryvale and Leavenworth claimants are on a legal and equitable parity, and whatever residue of guaranty funds is available when it comes their turn to be paid should be prorated between them. The commissioner's finding, in part, reads:

State, *ex rel.*, v. Bone.

"Finding No. 20.

". . . The record is silent as to whether the final dividend in one of them [Cherryvale and Leavenworth banks] was earlier in the day than the other. However, the record does show that in all of the findings and determinations made by the bank commissioner and the receiver, that the bank commissioner and the receiver determined as a matter of fact that the American State Bank of Cherryvale was liquidated prior to the State Savings Bank of Leavenworth. That is, in each of the lists of banks liquidated, introduced in evidence, the bank commisisoner and the receiver in each instance placed the American State Bank of Cherryvale ahead of the State Savings Bank of Leavenworth. There is no evidence to show that this was fraudulent, arbitrary or capricious, and in the absence of such evidence I have accordingly adopted and confirmed the priority as established by these administrative officers."

It appears that the only reason the name of the American State Bank of Cherryvale was entered first in the files and lists of the bank commissioner and receiver ahead of the State Savings Bank was merely one of alphabetical arrangement. On such a basis for precedence, if the banks of Allendale and Zeandale had been in these lists, and they, too, had been liquidated on January 30, 1926, there would be joy in the households of the men of Allendale and lamentation in the streets of Zeandale. When the Leavenworth bank broke, or was about to break, if those interested could have foreseen that they would come under the wire at the wind-up neck and neck with the depositors of the Cherryvale bank, would it have strengthened their claim to priority of payment out of the guaranty fund if steps had been taken to change the corporate name of the bank so as to give it alphabetical precedence over that of the American State Bank of Cherryvale? We only propound this homespun query to demonstrate the necessity of handling what money is available to satisfy the just demands of both groups of certificate holders on a more equitable basis than one furnished by the alphabet. The Cherryvale claimants cannot have precedence over the Leavenworth claimants, since there is no evidence to support their right thereto; and it necessarily follows that they and the Leavenworth claimants whose rights against the guaranty fund crystallized and became absolute on the same day must be put on an equality and paid *pro rata* as far as the funds will reach. (*State, ex rel., v. Davis,* 114 Kan. 270, 277, 217 Pac. 905.)

A brief is presented on behalf of claimants on the guaranty fund growing out of the failure of the Citizens State Bank of Geuda Springs, but it appears that the point in their case does not con-

cern their right of priority, but whether they have a valid claim on that fund. If their claims are good they will take precedence over the entire list of certificate holders here concerned, as their bank was liquidated on January 8, 1925, almost two months before the Manhattan bank, the first on the list set out above. (*Berry v. Peterson*, 123 Kan. 4, syl. ¶ 5, 254 Pac. 394.) A somewhat similar situation may govern the rights of certain claimants on the guaranty fund because of the failure of the Farmers State Bank of Quenemo. These two features of the present proceedings are details of administration needing no present discussion.

Counsel for depositors in the Citizens State Bank of Lane argue that the depositors in all the twenty-six failed banks now liquidated should share *pro rata* in the guaranty fund; that when the bank commissioner suspended administration of the guaranty law because of the deluge of problems, claims and demands which swept down on him as the extent of the guaranty fund's insolvency became generally known, a situation was created which put all liquidated banks in the same class, with no priority of one over the others, and in consequence they are entitled to equality of treatment in the distribution of the fund. We cannot approve this reasoning. This court could not judicially declare that the bank commissioner's perplexities and difficulties in administering the guaranty law and disbursing its insufficient assets among those entitled thereto, and in safeguarding those assets from ill-founded or untimely demands thereon, would be a sufficient excuse for disregarding the statutory order of payment. The right of priority for those holding certificates on banks fully liquidated to be paid in sequential order is statutory and protected by constitutional law. (*Thompson v. Bone*, 122 Kan. 195, 251 Pac. 178.)

Among those in precisely the same situation, as in the case of all the holders of certificates issued on account of the failure of a single bank, *pro rata* distribution of an insufficient fund would be proper, and indeed imperative; and similarly in the situation of the Cherryvale and Leavenworth bank claimants, where neither has a right of precedence, prorating is not only justified but required. In the soldiers' compensation case, when the authorized disbursement of $25,000,000 was discovered to be insufficient to pay in full all the Kansas troops which served in the world war, it was attempted, by some arbitrary method of bookkeeping or listing or what not, to pay some of the soldiers in full as far as the funds would reach, and let

the others wait until more funds were provided by legislative sanction. This court put a summary and emphatic stop to such project. (*State, ex rel., v. Davis*, 114 Kan. 270, 277, 283-285; 217 Pac. 905.) We there said that unless or until sufficient funds were provided to pay all soldiers in full, the fund must be prorated. But that rule was declared because the popular referendum and the statute both so provided. Suppose the law had declared that infantrymen should be paid first, artillerymen next, cavalrymen next, and so on, we would have had no choice but to follow the law. And it is simply the explicit mandate of the law which prevents a *pro rata* distribution of the bank guaranty fund. The statutory order of precedence must be followed; and no interpretation of the statute would warrant a *pro rata* distribution of the fund merely because it is insufficient to pay in full all legitimate claims against it.

But what shall be said as to the legal consequences arising from the failure of the receiver to certify to the bank commissioner the balances due on guaranteed deposits, which official act was intended by the statute to be the formal basis upon which the distribution of bank guaranty funds should be made. (R. S. 9-204.) This provision for certification by the receiver to the bank commissioner has been in the statute from its inception (Laws 1909, ch. 61, § 4), at which time the general banking law required that the receiver of an insolvent bank should be a resident of the county where the bank was located. (G. S. 1909, § 487.) Naturally in such a situation the official business dealings of the receiver and bank commissioner would be conducted by correspondence and with some formality. By successive amendments and changes in the methods of winding up insolvent banks the general receiver is now a functionary of the bank commissioner's office, virtually one of his staff of assistants, and not unnaturally some formality which existed when the receiver was located perhaps in a distant part of the state has been dispensed with now that the bank commissioner and his receiver occupy desks in adjoining office rooms in the statehouse. In practical effect the matter of certifying these balances is now no more than a formality. The bank commissioner is at all times in touch with his receiver's winding up of the bank, and he knows exactly when the bank is wound up without being told, and he knows when the guaranteed depositors are entitled to be paid out of the guaranty fund without the formality of the statutory certificate. However, if the receiver's certification were held to be an

indispensable prerequisite to the paying out of guaranty funds, it would not affect the rights of these claimants one iota. Mandamus would issue to compel certification, and the order in which that duty would be required would be in conformity with the dates upon which that duty ought to have been performed; that is, as of the dates on which the final dividends of these respective banks were paid. Consequently, the failure of the receiver to certify the balances does not alter the priority accorded by the statute.

These conclusions lead us to the final point requiring attention at this time. These proceedings have been protracted and complicated, and considerable expenses have necessarily been incurred for the services of a commissioner, special counsel for the bank commissioner, and otherwise. How shall these be paid? In an ordinary lawsuit, where one litigant wins and his adversary loses, the latter commonly has to pay the costs. This, however, is not an ordinary lawsuit; rather it is an agglomeration of what in technical aspects would have to be regarded as many lawsuits, where the many thousand individual claimants would all be entitled to win, and where no individual litigant was so far in the wrong as to be justly subjected to the payment of costs. Here, of course, the bank commissioner is the defendant, but only in his official capacity, and while the writ will issue against him, no facts are intimated which would subject him to liability for costs. (*Hicks v. Davis*, 100 Kan. 4, 163 Pac. 799; *Cates v. Knapp*, 104 Kan. 184, 178 Pac. 447.) Nor is this the sort of case where the legislature might fairly be asked to pay the expenses. The bank guaranty fund is not a state fund like the school fund or the general revenue fund, where the costs of litigation in protecting it or in properly administering it might create a quasi obligation which the legislature might properly be petitioned to pay. The bank guaranty system was designed as a voluntary institution, authorized and encouraged by the state, and to the success of which the state for well-nigh twenty years, at the taxpayers' expense, has contributed the services of its bank commissioner and attorney-general and their staffs of assistants, as well as those of its state printer in a substantial measure, and in a less but yet considerable degree the services of its state treasurer and state auditor. Not only was it intended to be a voluntary system of raising a fund to protect bank deposits, but the statute itself disavowed the state's responsibility for the system, and expressly forbade any declaration that the state was a guarantor of deposits

of banks contributing to the guaranty fund.  The pertinent feature of the statute provided:

". . . Any managing officer of any bank guaranteed under this act, or any person acting in its behalf or for its benefits,  . . .  who shall display any card or other advertising tending to convey the impression that the deposits of the bank are guaranteed by the state of Kansas, either directly or indirectly, shall disqualify the bank from further participation in the bank depositors' guaranty fund, and forfeit its bonds or money deposited in lieu thereof, with the state treasurer for the benefit of such fund.  . . ."  (R. S. 9-207.)

It is quite obvious, also, that the holders of valid certificates on the guaranty fund whose claims are so far down in the list that they will get nothing, or at most but a few cents on the dollar, cannot be required to meet the cost of this litigation.  It seems imperative that those who are so fortunate as to participate in the distribution of the fragmentary assets will have to bear proportionately the cost of these proceedings under general principles of equity. (Merwin's Principles of Equity, § 1018; 7 R. C. L. 783-786; 15 C. J. 103-105.)

The writ prayed for will issue, and jurisdiction of the cause will be retained for such further orders as its exigencies may require.